James A. FORD, Appellant,

v.

UNITED STATES, Appellee.

No. 86–1444.

District of Columbia Court of Appeals.

Argued Jan. 14, 1988.
Decided Nov. 10, 1988.

Sharon D. Styles, Public Defender Service, Washington, D.C., for appellant. James Klein, Jennifer P. Lyman, and Scott W. Howe, Public Defender Service, Washington, D.C., were on the brief for appellant.

Patty Merkamp Stemler, Atty., United States Department of Justice, with whom Joseph E. diGenova, U.S. Atty. at the time the brief was filed, Michael W. Farrell and Thomas J. Motley, Asst. U.S. Attys., Washington, D.C., were on the brief for appellee.

Before ROGERS,* Chief Judge, FERREN and STEADMAN, Associate Judges.

STEADMAN, Associate Judge:

This case centers around a stabbing incident involving three young cousins living in the same household. Appellant, James Ford, was unconstitutionally denied the opportunity to cross-examine one of the witnesses (his cousin Warren Washington) to show bias or, more specifically, motive to lie. We therefore must reverse.

I.

Ford lived in the same household with Warren and Reymonte Washington, cousins to each other and to Ford. The stabbing took place in the nighttime in the third-floor bedroom where Warren and Reymonte were sleeping. (Ford normally also slept in that bedroom, although that night he had said he was going to sleep in a front room.) Reymonte's sister Veronica was in an adjoining bedroom. Reymonte

---

* Judge Rogers was an Associate Judge of this court at the time of argument. Her status changed to Chief Judge on November 1, 1988.

testified that when he was awakened by Warren's yelling, he saw Ford stabbing Warren with a kitchen knife his aunt, Betty, Ford's mother, had recently purchased. He later realized that he too had been stabbed, apparently in his sleep before he was awakened. (No one actually witnessed Reymonte being stabbed, although unquestionably he had been wounded by someone.) Warren himself testified that Ford stabbed him. Veronica testified that she was awakened by screaming coming from the bedroom, and that when she went there the door opened, Warren ran out, and she saw Ford in the room with the kitchen knife. Betty Ford also arrived at the same time, but she did not testify at trial.[1]

Ford was charged with two counts of assault with intent to kill, one against Warren Washington and one against Reymonte Washington. He was acquitted on the charged counts and on the lesser-included offense of assault with a dangerous weapon against Reymonte. He was convicted only of assault with a dangerous weapon against Warren.

## II.

During the government's direct examination of Warren, the court entertained an extensive colloquy about whether, and to what extent, the defense could cross-examine Warren to show bias.[2] Ford's counsel at this point spelled out her bias theory, in detail.[3] Essentially it was that although Warren knew the stabbing was by someone other than Ford, or, at the very least, was less sure than his trial testimony indicated that Ford was the attacker, he had named Ford as the culprit in his (Warren's) self-interest and self-protection. More specifically the bias theory had two elements. First, if Warren had admitted or opened up the possibility that the assailants were outside intruders, "he would have also to confess to extensive drug usage, drug dealing, stealing and other things he is trying to cover up." Second, he was afraid to name the actual assailants because he feared further retaliation from them. Ford's counsel requested permission from the trial court to cross-examine Warren about the following facts (which if denied she was prepared to prove by extrinsic testimony): 1) Warren's extensive drug use and drug dealing, including undercutting other dealers; 2) Warren's indebtedness incurred to procure drugs, including stealing from the household and from others; 3) people coming to the house, unannounced, demanding money that Warren owed, and making threats against family members; 4) people getting into the house during the night (because Warren didn't lock up properly) and taking things in satisfaction of Warren's drug-related debts; 5) threats made outside the house, both against Warren's mother and against Warren in the courthouse elevator.[4]

We deal here with a difficult interaction of three somewhat competing doctrines. We have a claim of bias, as to which cross-examination is "always rele-

---

**1.** Veronica testified that Ford said to his mother, "No don't nobody love me, let me kill myself," and then dropped the knife on the bed.

**2.** Although the bias is not claimed to be a personal bias for or against a party, a "motive to lie" plainly falls within the bias doctrine. *Delaware v. Van Arsdall,* 475 U.S. 673, 680, 106 S.Ct. 1431, 1436, 89 L.Ed.2d 674 (1986); *Washington v. United States,* 499 A.2d 95, 101 n. 3 (D.C. 1985). *See United States v. Abel,* 469 U.S. 45, 52, 105 S.Ct. 465, 469, 83 L.Ed.2d 450 (1984) (bias may be induced by witness' self-interest); *Stack v. United States,* 519 A.2d 147, 154 (D.C.1986) (bias in possible fabricating to avoid blame on oneself); *United States v. Kinnard,* 150 U.S.App. D.C. 386, 391, 465 F.2d 566, 571 (1972) (addict may lie to avoid retribution from drug figures).

**3.** The government argues that Ford's proffers were inadequate. We disagree. The trial court itself stated, with reference to the similar proffers, made later at trial, of extrinsic proof of these circumstances, that Ford's counsel had "done an admirable job of capsulating what she indicated she would have put on...." Ford's counsel proffered myriad facts to "'support a genuine belief' that [Warren was] biased in the manner asserted," *Jones v. United States,* 516 A.2d 513, 517 (D.C.1986), and, unlike the situation in *Jones,* laid out the connection between the proffered evidence and the motive to lie.

**4.** In a letter to this court supplementing his brief, Ford corrected his initial claim before us that these proffers were specifically of threats which occurred prior to the stabbing, as opposed to during the five-month period between the stabbing and the trial.

vant" and is protected by constitutional considerations. *Delaware v. Van Arsdall,* 475 U.S. 673, 677, 106 S.Ct. 1431, 1434, 89 L.Ed.2d 674 (1986) (citation omitted); *In re C.B.N.,* 499 A.2d 1215 (D.C.1985). Yet "given the highly inflammatory nature of an allegation that a witness is a drug user," drug usage other than at the time of the incident testified about is "generally" not a proper subject of cross-examination. *Rogers v. United States,* 419 A.2d 977, 981 (D.C.1980). Finally, while evidence may be presented that someone other than the defendant committed the crime, such evidence can be deemed relevant and thereby admissible only when it clearly links that other person to the commission of the crime, and a proffer must so indicate. *Beale v. United States,* 465 A.2d 796, 803 (D.C.1983), *cert. denied,* 465 U.S. 1030, 104 S.Ct. 1293, 79 L.Ed.2d 694 (1984). *See Shepard v. United States,* 538 A.2d 1115 (D.C.1988); *Stack v. United States,* 519 A.2d 147 (D.C. 1986).

■ The government argues that *Rogers* and *Beale* control this case. But here the defense wanted to use this type of evidence specifically to show that Warren was a biased witness. The Supreme Court has established that the refusal to allow *any* questioning about facts indicative of bias from which the jury could reasonably draw adverse inferences of reliability is an error of constitutional dimension, violating the defendant's rights secured by the Confrontation Clause. *Delaware v. Van Arsdall, supra,* 475 U.S. at 678–79, 106 S.Ct. at 1435–36; *Davis v. Alaska,* 415 U.S. 308, 318, 94 S.Ct. 1105, 1111, 39 L.Ed.2d 347 (1974). Thus, we must determine whether

the trial court's rulings prohibited *all* inquiry into the possibility of bias under defendant's theory.

The trial court ruled here that counsel could question Warren, as permitted by *Rogers,* about the last time he took cocaine before the incident "and whether there were any effects from that ingestion still present at the time of the event." It also ruled that Warren could be questioned about "whether he is lying when he says that his cousin, Mr. Ford, did it; whether he really knows who the perpetrator was, questions along those lines." However, beyond these permitted questions,[5] the court essentially ruled that counsel could not make any inquiry about other drug use and drug dealing. Moreover, in response to defense counsel's request for clarification of the ruling, the court ruled that counsel could not ask about any indebtedness or threats even if no mention were made of their tie-in to drug use.[6] Thus, the court effectively disallowed any questioning related to Warren Washington's motive to lie, *i.e.,* to point his finger at Ford.[7]

Nor can we say that, had bias cross-examination of Warren been allowed, the verdict would have been the same beyond a reasonable doubt, and thus the error constitutionally harmless. *Delaware v. Van Arsdall, supra,* 475 U.S. 680, 106 S.Ct. 1436, citing *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). Although it is true that no motive to lie on the part of either Reymonte or Veronica was presented, cross-examination of Reymonte drew into question his account of

---

5. Warren testified that he had smoked marijuana earlier that evening and had used cocaine two or three days earlier. He said he was still "somewhat high" from the marijuana at the time of the stabbing but that it did not affect his vision or memory. He denied that he was covering up for anyone because he was afraid about what would happen if he told the truth.

6. It appears quite clear that the court's rulings were based on its reading of the *Rogers* case as establishing that a witness' involvement with drugs, outside their direct impact on relevant perceptions, is "an area that is pretty well forbidden." The court banned all mention of the threats and indebtedness in response to the

government's argument that they would inevitably be tied to drug use by the questions permitted regarding Warren's use of drugs near the time of the stabbing. See note 5, *supra.*

7. Direct questions about whether Warren was lying or covering up for somebody could in no way reveal his *motive* for doing so. *See Davis v. Alaska,* 415 U.S. 308, 318, 94 S.Ct. 1105, 1111, 39 L.Ed.2d 347 (1974) ("While counsel was permitted to ask Green *whether* he was biased, counsel was unable to make a record from which to argue *why* Green might have been biased.") (emphasis in original).

the events[8] and Veronica was not an eyewitness to the crime itself. Ford's motive in committing a stabbing was not at all clear. The jury seemed far from certain about the true course of events. It sent out a note during deliberation that it was unable to come to a unanimous verdict, asked for reinstruction on reasonable doubt, sent out a request indicating it may have considered the possibility of another assailant,[9] and eventually acquitted appellant on three of the four counts. Washington was an important government witness. We are unable to conclude that the impairment of his credibility through bias cross-examination would not, beyond a reasonable doubt, have affected the outcome of the case. *See In re C.B.N., supra,* 499 A.2d at 1221 and cases cited.

This is not to say that appellant was necessarily entitled to undertake the full range of the cross-examination and evidentiary submission set forth in his proffer. The Supreme Court made clear in *Van Arsdall:*

> [T]rial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant. And as we observed earlier this Term, "the Confrontation Clause guarantees an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." *Delaware v. Fensterer,* 474 U.S. 15, 20 [106 S.Ct. 292, 295, 88 L.Ed.2d 15] (1985) (*per curiam*) (emphasis in original).

*Delaware v. Van Arsdall, supra,* 475 U.S. at 679, 106 S.Ct. at 1435.

We have likewise recognized the discretionary role of the trial court in controlling bias cross-examination. *See, e.g., Washington v. United States,* 499 A.2d 95, 101 (D.C.1985). Its determination is guided by a judicious balancing of the considerations opposing introduction of drug activity and accusation of others as perpetrators of the crime against the right to inquire into possible bias guaranteed by *Van Arsdall.* We fully recognize the "highly inflammatory nature" of drug activity allegations, *Rogers v. United States, supra,* 419 A.2d at 981, and the disruptive effect of leveling blame for the crime on another, with its "propensity to mislead the jury or confuse them" by requiring a distractive mini-trial. *Brown v. United States,* 409 A.2d 1093, 1097 (D.C.1979). But these prohibitions are not absolutes, any more than is an unlimited right to show bias. "In this case, however, the trial court prohibited *all* inquiry into the possibility [of a motive for bias]", and thus "the court's ruling violated respondent's rights secured by the Confrontation Clause." *Delaware v. Van Arsdall, supra,* 475 U.S. at 679, 106 S.Ct. at 1435 (emphasis in original). Accordingly, the judgment must be reversed and the case remanded for a new trial.

REVERSED AND REMANDED.

8. For example, he testified that after he awoke, a minute or so passed before he realized he had been stabbed twice in the abdomen, during which time he bent over to turn on the light and otherwise had been active. He said that this was his first time sleeping in that particular bedroom in almost a year and that he had been sleeping "very soundly" and was "pretty groggy" when he woke up. Veronica testified that when, at the house, the driver of the ambulance which took the victims to the hospital asked Reymonte what happened and "who did this," Reymonte and Warren both said "I don't know."

9. The request was for a photograph of the outside of the home, which showed the location of the bedroom window.