570 A.2d 814 (1990)
In the Matter of S.H., Appellant.
No. 87-588.
District of Columbia Court of Appeals.
Argued April 21, 1989.
Decided February 28, 1990.
Richard S. Greenlee, Public Defender Service, with whom James Klein, Jennifer P. Lyman, and Henderson Hill, Public Defender Service, Washington, D.C., were on the briefs, for appellant.
Mary L. Wilson, Asst. Corp. Counsel, with whom Frederick D. Cooke, Jr., Corp. Counsel at the time the briefs were filed, and Charles L. Reischel, Deputy Corp. Counsel, Washington, D.C., were on the brief, for the District of Columbia.
Before ROGERS, Chief Judge, and BELSON and STEADMAN, Associate Judges.
STEADMAN, Associate Judge:
Appellant, a juvenile, appeals from the trial court's adjudication of delinquency for felony murder and two related counts. Appellant makes two principal assignments of error. First, the trial court erred in forbidding in cross-examination any inquiry into bias of a key government witness stemming from his friendship with a possible alternative perpetrator of the crime. Second, the trial court erred in applying the "reverse Jencks" rule in juvenile proceedings, notwithstanding the absence of any statute or rule provision so authorizing, and in enforcing this rule by personally examining the file of a defense investigator in a vain search for reverse Jencks material.
*815 As a threshold matter, we have decided on the particular facts of this case not to dismiss this appeal notwithstanding appellant's two escapes and recapture while the appeal has been pending. On the merits, we find that both grounds of error are controlled by prior decisions of this court. The first ground itself requires reversal. Since further proceedings are possible, we also take occasion to review the second ground of error.

I
During the pendency of this appeal, S.H. twice absconded from the custody of the juvenile authorities and was recaptured both times. Upon being advised of the first escape, which occurred after the appeal had been scheduled for argument,[1] we removed the case from the calendar and held the appeal in abeyance. After he was apprehended on February 2, 1989, his appeal was recalendared. This court heard oral argument on April 21, 1989. In July 1989, S.H. again absconded. We then ordered briefing on the issue whether the appeal should be dismissed under the principle recited in Molinaro v. New Jersey, 396 U.S. 365, 90 S.Ct. 498, 24 L.Ed.2d 586 (1970) (per curiam).[2] On November 8, 1989, while the parties were still preparing their briefs on this question, S.H. was reapprehended. He remains in juvenile custody.[3]
"Disposition by dismissal of pending appeals of escaped prisoners is a longstanding and established principle of American law." Estelle v. Dorrough, 420 U.S. 534, 537, 95 S.Ct. 1173, 1175, 43 L.Ed.2d 377 (1975) (per curiam).[4] "[A]fter the convicted defendant who has sought review escapes from the restraints placed upon him pursuant to the conviction," his escape "disentitles the defendant to call upon the resources of the Court for determination of his claims." Molinaro, supra, 396 U.S. at 366, 90 S.Ct. at 498-99. See also, e.g., United States v. Parrish, ___ U.S.App.D.C. ___, ___, 887 F.2d 1107, 1107 (1989) (per curiam); United States v. Persico, 853 F.2d 134, 136 (2d Cir.1988); United States v. Puzzanghera, 820 F.2d 25, 26 (1st Cir.), cert. denied, 484 U.S. 900, 108 S.Ct. 237, 98 L.Ed.2d 195 (1987); Young v. State, 518 So.2d 822, 824 (Ala.Crim.App.1987), cert. denied, ___ U.S. ___, 109 S.Ct. 93, 102 L.Ed.2d 69 (1988); Mason v. State, 440 N.E.2d 457, 458 (Ind.1982); Commonwealth v. Hurley, 391 Mass. 76, 76-78, 461 N.E.2d 754, 755 (1984); State v. Rogers, 90 N.J. 187, 188-190, 447 A.2d 537, 538-39 (1982); Commonwealth v. Passaro, 504 Pa. 611, 613-15, 476 A.2d 346, 348 (1984). Appellate courts are free to dismiss the appeal of a fugitive even where an appeal lies as of right by statute[5] or state constitutional *816 provision. See, e.g., Young, supra, 518 So.2d at 824 (state statute); Passaro, supra, 504 Pa. at 613-15, 476 A.2d at 348 (state constitutional provision).[6] Where the appellant is still at large, one rationale for dismissal is clear: As stated many years ago by the Supreme Court in Allen v. Georgia, 166 U.S. 138, 141, 17 S.Ct. 525, 526, 41 L.Ed. 949 (1897):
Otherwise [appellant] is put in a position of saying to the court: "Sustain my writ and I will surrender myself, and take my chance upon a second trial; deny me a new trial and I will leave the State, or forever remain in hiding." We consider this as practically a declaration of the terms upon which he is willing to surrender, and a contempt of its authority, to which no court is bound to submit.
Furthermore, dismissal prevents the waste of judicial time and effort on a decision which may have no practical effect. State v. Bono, 103 Wis.2d 654, 654-56, 309 N.W.2d 400, 400 (Ct.App.1981).
Once an appellant has absconded, an appellate court acts within its discretionary powers in refusing to consider or to reinstate the appeal even if the appellant later returns to the jurisdiction and comes once again within the power of the court. For instance, if a fugitive appellant is apprehended before the appeal is heard, the court may nevertheless dismiss the appeal after his apprehension. See, e.g., Parrish, supra, ___ U.S.App.D.C. at ___, 887 F.2d at 1107-08; Puzzanghera, supra, 820 F.2d at 26-27. Similarly, if an appellate court dismisses a case because the appellant has absconded, the court has discretionary power to deny appellant's motion to reinstate the appeal. See, e.g., Hurley, supra, 391 Mass. at 76-80 & 78 n. 2, 461 N.E.2d at 755-56 & 755 n. 2 and cases cited therein. Cf. White v. State, 514 P.2d 814, 816 (Alaska 1973) (court will exercise discretion to reinstate an appeal where there is a showing of good cause). In such cases, different reasons justify the court's refusal to consider the appeal. For one, an appellant who flees "disdains the entire judicial system." Parrish, supra, ___ U.S.App.D.C. at ___, 887 F.2d at 1108. Under this view, appellate review is inappropriate for one who "flouts the judicial process by escaping." Persico, supra, 853 F.2d at 137. Second, a rule of dismissal in such cases "has the salutary effect of discouraging escape." Id.[7] Third, an appellant's escape burdens an appellate court with "additional time-consuming activities."[8]Puzzanghera, supra, 820 F.2d at 27. Dismissal is an appropriate method of deterring such interference with the "efficient operation" of the appellate court. Persico, supra, 853 F.2d at 137. Fourth, the delay generated by an appellant's flight may prove prejudicial to the government, both in preparation of the appeal and on retrial should the appeal prove successful. Parrish, supra, ___ U.S.App.D.C. at ___, 887 F.2d at 1108; Persico, supra, 853 F.2d at 137.[9]
*817 With respect to the case before us, we are cognizant that we have not heretofore in any published opinion applied the Molinaro sanction, and in particular that we did not do so following S.H.'s first escape. We note also that this is a juvenile proceeding. Furthermore, the total time during which S.H. was out of the control of the juvenile authorities as a result of his two escapes was not of such extended duration[10] that the government asserts it will suffer any prejudice in a retrial of the case.
Accordingly, we have determined not to dismiss this appeal on the particular facts of this case. We now turn to the merits.

II
This proceeding arose out of a killing of a young man sitting in the passenger seat of a car at Condon Terrace, a drug-sale area.[11] The car was approached by several teen-age boys, and one of them killed the decedent with a single shot. A principal issue at trial was whether the killer was appellant or, as the defense alleged, another teenager present at the scene, Vincent Brown.
A key government witness was nineteen-year-old Michael Cox, who knew both appellant and Brown.[12] He testified that appellant, not Brown, fired the shot. Through cross-examination, appellant sought to show that Cox was a long-time friend of Brown; and that he was lying to protect his friend. Appellant's counsel began the examination by asking the "ultimate question," i.e., whether Cox was protecting Brown. This was denied by Cox. The trial court refused to allow any further examination on this issue of bias and improperly would not permit counsel to make a detailed proffer for the record as to what was hoped to be elicited through more thorough cross-examination.[13]
Recently, in Ford v. United States, 549 A.2d 1124 (D.C.1988), we had occasion to review the constitutional principles that are controlling here. As we observed, "[t]he Supreme Court has established that the refusal to allow any questioning about facts indicative of bias from which the jury could reasonably draw adverse inferences of reliability is an error of constitutional dimension, violating the defendant's rights secured by the Confrontation Clause." Id. at 1126 (citing Delaware v. Van Arsdall, 475 U.S. 673, 678-79, 106 S.Ct. 1431, 1435-36, 89 L.Ed.2d 674 (1986)) (emphasis in original). Direct questions asking whether a witness is lying or covering up for someone are insufficient in themselves to reveal his [or her] motive for doing so.[14]Id. at 1126 n. 7. We quoted from Davis v. Alaska, 415 U.S. 308, 318, 94 S.Ct. 1105, 1111, 39 L.Ed.2d 347 (1974), where the Court, in reversing for excessive limitation on inquiry *818 into bias, stated: "While counsel was permitted to ask [the witness] whether he [she] was biased, counsel was unable to make a record from which to argue why [the witness] might have been biased." Ford, supra, 549 A.2d at 1126 n. 7 (emphasis in original). And we also have held that "the trial court may not require counsel to ask questions in conclusory form of a witness whom he [she] is questioning in order to demonstrate bias." Petway v. United States, 391 A.2d 798, 801 (D.C.1978) (citation omitted).
Nor can we conclude that, had bias cross-examination of Cox been allowed, the outcome would have been the same beyond a reasonable doubt and hence constitutionally harmless. We deal with a bench trial, to be sure, but neither we nor the trial court can know what a bias inquiry of this important witness might have led to. The evidence against appellant, while strong, was hardly overwhelming.[15] The Ford holding is controlling here.

III
The Jencks Act, 18 U.S.C. § 3500 (1984), requires that the government turn over to the defense any pretrial statements made by witnesses after they have testified on direct examination. 18 U.S.C. § 3500(b). "Reverse Jencks" refers to the reciprocal practice which allows the government to obtain statements made by witnesses who testify for the defense at trial. Both Jencks and reverse Jencks are applicable in adult criminal proceedings through Super. Ct.Crim.R. 26.2 (1989).
At issue in this case was not whether a particular document was Jencks material, but whether a particular document (a witness's pretrial statement) even existed at all. When defense counsel, after a voir dire of its investigator in which she stated that no such statement existed, objected to turning over the file on the ground that reverse Jencks has not been adopted in juvenile proceedings, the trial court stated that application of reverse Jencks was "routinely" the practice in her court and demanded that the file be delivered to her. The trial court then proceeded to call a recess, stating that the review of the investigator's file was "going to take a while." This review was apparently conducted out of the presence of defense counsel, as well as that of the government.
The controlling decision here is Middleton v. United States, 401 A.2d 109 (D.C. 1979), in which we held that reverse Jencks discovery could not be conducted in circumstances analogous to appellant's. The government contends that the trial court's application of reverse Jencks to juvenile proceedings was a proper exercise of its "inherent powers" to control the discovery process, citing United States v. Nobles, 422 U.S. 225, 95 S.Ct. 2160, 45 L.Ed.2d 141 (1975). It is undoubtedly true, as we ourselves have recognized, that "[i]n proper circumstances, those [inherent] powers may support the compelled production of previously recorded witness statements in the possession of the defense." Middleton, supra, 401 A.2d at 118.[16] However, here the trial court did not make a narrow ruling based on the precise evidentiary posture *819 of the case before it.[17] Rather, it applied an apparent across-the-board policy requiring production of reverse Jencks statements, notwithstanding the absence of any statutory or rule-based authority therefor. This is proscribed by Middleton. While the Superior Court has enacted a rule allowing for reverse Jencks discovery in adult criminal cases, Super.Ct.Crim.R. 26.2 (1989), no such rule has been adopted for juvenile adjudication. In sum, since the defense had no obligation to produce any reverse Jencks statements, necessarily the trial court had no grounds to search the defense investigator's files in search of such statements.
Even if reverse Jencks were permitted in juvenile proceedings, the action of the trial court here would raise serious concerns. A trial court as finder of fact should refrain from unnecessary exposure to off-the-record information regarding the proceeding before it. Here, the defense investigator's file contained, among other information, the names of approximately eighty people with whom the defense had spoken but decided not to call as witnesses, presumably because their testimony would be either unhelpful or damaging to the defendant. While the trial judge only looked through those portions of the file marked "statements," she was still potentially exposed to other information in the file[18] and, for example, made aware of the fact that such a large number of people had been interviewed by the defense to no avail. "The essence of the judicial role is neutrality. A trial judge must remain a disinterested and objective participant in the proceeding and [o]nce his [her] neutral position has been jeopardized, the judicial evenhandedness that should pervade the courtroom disappears and the right to a fair trial may be imperiled." Butler v. United States, 414 A.2d 844, 852 (D.C.1980) (en banc) (citations and internal quotation marks omitted). While it is of course true that a trial judge exposed to inadmissible information is presumed to be able to disregard such evidence, we have indicated that trial courts in some such situations may be called upon to recuse themselves. Id. at 852; see Banks v. United States, 516 A.2d 524 (D.C.1986), cert. denied, 484 U.S. 975, 108 S.Ct. 485, 98 L.Ed.2d 483 (1987). A need for caution, not evident here, is thus manifest.
Reversed and remanded.
NOTES
[1] Initially, the case was scheduled to be heard on December 8, 1988.
[2] In Molinaro, the Supreme Court dismissed an appeal where the appellant, who was free on bail, had failed to surrender himself to state authorities and was deemed a fugitive by the state.
[3] Under D.C. law, where, as here, a person commits a crime while under 16 years of age, he or she remains within the juvenile system with respect to that offense until he or she reaches the age of 21 years. D.C.Code § 16-2301(3) (1989). S.H. attained 18 years of age on January 22, 1989.
[4] Estelle sustained the constitutionality of a Texas statute which provided for the automatic dismissal of a pending appeal by an escaped felon who fails to surrender voluntarily within 10 days of the escape. In that case, the prisoner had been recaptured two days after his escape.
[5] Although it did not specifically discuss the point, the Molinaro case involved an appeal brought under 28 U.S.C. § 1257(2) (1970), since repealed, which provided for mandatory Supreme Court jurisdiction "[b]y appeal" in cases from state courts "where is drawn in question the validity of a statute of any state on the ground of its being repugnant to the Constitution, treaties or laws of the United States." See 16 C. WRIGHT, A. MILLER, E. COOPER & E. GRESSMAN, FEDERAL PRACTICE AND PROCEDURE § 4003, at 500 (1977) (statutes providing Supreme Court jurisdiction "by appeal," unlike those creating certiorari jurisdiction, "establish an obligatory jurisdiction"). Furthermore, all federal circuit court dismissals of appeals involve appeals as of right under 28 U.S.C. § 1291 (1982). See Coppedge v. United States, 369 U.S. 438, 441, 82 S.Ct. 917, 919, 8 L.Ed.2d 21 (1962) ("[p]resent federal law has made an appeal from a District Court's judgment of conviction in a criminal case what is, in effect, a matter of right") (footnote omitted).
[6] There is no federal constitutional right to an appeal of a criminal conviction. Abney v. United States, 431 U.S. 651, 656, 97 S.Ct. 2034, 2038, 52 L.Ed.2d 651 (1977); see also Estelle v. Dorrough, supra, 420 U.S. at 536, 95 S.Ct. at 1175 (no federal constitutional right to state appellate review of a state criminal conviction).
[7] In ordinary circumstances, however, the fact that dismissal of a fugitive's appeal may deter escape may not alone be a strong justification for dismissal. At least for adult offenders, Congress has already prescribed sanctions for escape from lawful custody; that offense is punishable by up to five years' imprisonment. D.C. Code § 22-2601 (1989). See White, supra, 514 P.2d at 815-16 ("[w]e fail to find any reason why this court by judicial decree, should add withdrawal of the right of appeal to the statutory punishments prescribed for the crime of escape"); Marshall v. State, 344 So.2d 646, 648 (Fl.Dist.Ct.App.1977) (denying motion to dismiss case of a re-apprehended appellant in part because "our legislature has established escape as a separate crime for which a person can receive a sentence of up to fifteen years").
[8] In this case, for example, appellant's flight forced this court to devote two calendar spaces to a single appeal. Additional resources have been consumed in the briefing of the escape issue and preparation of this opinion.
[9] For recent instances where courts have decided an appeal on the merits after the recapture of a fugitive appellant, see State v. Byrd, 448 N.W.2d 29, 30-31 (Iowa 1989) (refusing to dismiss fugitive's appeal after his recapture); Hurley, supra, 391 Mass. at 78-82, 461 N.E.2d at 756-57 (reinstating recaptured fugitive's appeal provided that the trial court finds no prejudice to the government because of delay caused by appellant's flight); State v. Tuttle, 713 P.2d 703, 705 (Utah 1985) (reinstating recaptured fugitive's appeal).
[10] Appellant gets no credit for this happenstance, however. His first reapprehension occurred when he was arrested and charged as an adult with possession of marijuana and PCP. That case was later dismissed. The second recapture occurred when appellant was arrested for reckless driving and driving without a permit. He awaits trial as an adult on charges of unauthorized use of a motor vehicle and assault on a police officer while armed.
[11] There was a dispute whether the driver of the car got lost and happened on to Condon Terrace, or whether she had come there deliberately to purchase drugs. It was the decedent's twenty-first birthday and the driver was his mother.
[12] The only other eyewitness testimony was that of the decedent's mother, who identified S.H. in a show-up several hours after the killing. In the interim, she had taken her son to the hospital where he was pronounced dead and had also been to the police station.
[13] The trial court cut short appellant's original proffer in the middle of the second sentence by sustaining the objection to further questioning on the subject. Subsequently, an attempt by appellant's counsel to make part of the record a written statement setting forth the proposed line of questioning was denied.
[14] See United States v. Robinson, 174 U.S.App. D.C. 224, 227, 530 F.2d 1076, 1079 (1976) ("Bias is never classified as a collateral matter which lies beyond the scope of inquiry, nor as a matter on which an examiner is required to take a witness's answer. Bias may be proved ... even after a witness's disavowal of partiality" (quoting 3 WEINSTEIN'S EVIDENCE § 607[03] at 607-17 (1975))).
[15] The government argues that any error was harmless because Cox's credibility had already been sufficiently drawn into question through revelation of three drug-related delinquency adjudications and the grant of use immunity for his testimony. However, the issue of bias, based on his friendship with Brown, involves a distinct attack on the substance of Cox's testimony (i.e., his motivation to finger appellant as the killer instead of Brown), which went to the heart of appellant's defense.
[16] In Nobles, for example, a dispute existed whether the courtroom evidence given by prosecution witnesses was inconsistent with pretrial statements given to a defense investigator. The defense called the investigator to the stand to testify as to those pretrial interviews, but the trial court barred such testimony unless the defense produced the investigator's pretrial record of those interviews. The Supreme Court agreed with the trial court's view that the investigator's report was "highly relevant to the critical issue of credibility," 422 U.S. at 232, 95 S.Ct. at 2167, and held that any right to withhold had been waived by the election to present the investigator as a witness to contrast his recollection of the contested statements with that of the prosecution's witnesses. Id. at 239, 95 S.Ct. at 2170.
[17] The defense investigator was called as a defense witness, but only to testify to the authenticity of photographs of the area of the crime. The government argues that since the statements in question were those given by another defense witness to the investigator, the defense's calling of that other defense witness justified the requirement that the defense produce any pretrial statement given by that witness. The problem with this reasoning is that it would in effect amount to a blanket reverse Jencks rule applicable to all defense witnesses. We do not agree with the government's assertion that we impliedly sanctioned such a routine requirement in the language of footnote 27 of the Middleton opinion. Middleton, supra, 401 A.2d at 121 n. 27.
[18] The file is reported to have been composed of eleven sections, as follows: "Criminal information and reports"; "Statements"; "Subpoenas and I.D. forms"; "Follow-up info"; "Miscel."; "Memos from the attorney"; "Car information"; "Subpoenas (served)"; "Police reports and infor."; "Memos to the file I"; and "Memos to the file II."