603 A.2d 839 (1991)
In re W.L., Appellant.
No. 90-787.
District of Columbia Court of Appeals.
Argued November 14, 1990.
Decided November 20, 1991.
Rehearing En Banc Denied April 14, 1992.
*840 Carol Steiker, Public Defender Service, with whom James Klein, Public Defender Service was on the brief, for appellant.
Charles L. Reischel, Deputy Corp. Counsel, with whom Herbert O. Reid, Sr., Corp. Counsel at the time the brief was filed, and Mary L. Wilson, Asst. Corp. Counsel, were on the brief, for appellee District of Columbia.
Before STEADMAN, SCHWELB, and WAGNER, Associate Judges.
WAGNER, Associate Judge:
Appellant, now a fifteen year old, was adjudicated to be a child in need of supervision (CINS) for habitual truancy from school under D.C.Code § 16-2301(8)(A)(i) (1989). A disposition order was entered by the court on June 6, 1989 under the terms of which the child was committed restrictively for an indeterminate period not to exceed two years to the Department of Human Services of the District of Columbia (DHS).[1] The disposition order also provided for the child's immediate placement at the Hoffman Home, a residential facility in Pennsylvania. After placement at the Hoffman Home, W.L. returned to court for an intermediate review on March 16, 1990. W.L. absconded from custody after the court proceeding, and an Order for Custody was issued on March 21, 1990 for the child's return.[2] W.L. was not located for two months, and upon his return to custody, the trial court entered an order for W.L. to be kept temporarily at the Receiving Home for Children (Receiving Home) and to be segregated from adjudicated delinquents because of his status as a CINS. The trial judge denied W.L.'s motion for reconsideration, and on June 14, 1990, returned the child to the Receiving Home (with a similar segregation order) pending completion of psychiatric, psychological, and physical examinations, and an educational assessment and location of another residential facility which would accept him. On appeal, appellant argues that the order for W.L.'s placement at the Receiving Home violates D.C.Code § 16-2320(d) (1989) which prohibits placement of children adjudicated in need of supervision in a facility for delinquents. Finding no error on this record, we affirm.
At the hearing on W.L.'s motion for reconsideration of placement, government counsel and Neil Hoffman, an employee of the Receiving Home, represented that the Receiving Home is a facility for detained youth awaiting trial. However, Hoffman reported that adjudicated delinquent children are placed at the Receiving Home pursuant to orders of the Superior Court and that fifteen such children (or half of the population) were at the facility as of the date of the hearing. Only two other CINS children were at the Receiving Home during W.L.'s stay, and W.L. was allowed recreation periods with them. W.L. was given a private room, although he was on a unit where some committed delinquents were housed. Hoffman represented that children are placed on various units according to gender and size and that all children at the facility attend the same school and participate in therapy or counseling together.
Having determined that there was no alternative secure placement to assure that W.L. would remain available for the assessments necessary to facilitate an appropriate placement,[3] the trial court ordered that respondent be held at the Receiving Home and segregated from delinquent youths.[4] Upon entering the challenged order, the trial judge emphasized repeatedly the requirement that W.L. not be commingled with delinquent children and that the requirement *841 of separation be observed for all activities, including school.
By the time of the argument on appeal, the trial court had ordered W.L. to be placed in a group home. W.L. was no longer being detained under the order appealed from.[5] Therefore, we determine first whether this development moots the issue raised on appeal. We hold that it does not, as the issue is one "capable of repetition, yet evading review." See Southern Pacific Terminal Co. v. ICC, 219 U.S. 498, 515, 31 S.Ct. 279, 283, 55 L.Ed. 310 (1911). The Supreme Court has confined this exception to the mootness doctrine, absent a class action, to situations where: "(1) the challenged action was in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there was a reasonable expectation that the same complaining party would be subjected to the same action again." Weinstein v. Bradford, 423 U.S. 147, 149, 96 S.Ct. 347, 348, 46 L.Ed.2d 350 (1975) (citing Sosna v. Iowa, 419 U.S. 393, 95 S.Ct. 553, 42 L.Ed.2d 532 (1975)).
This court has declined to adhere strictly to the requirements set forth in Weinstein. See Lynch v. United States, 557 A.2d 580, 582 (D.C.1989). The quasi-class action nature of a case, while a factor to be considered in a mootness challenge, is not a necessary condition to deciding an issue. Id. at 582-83. In Lynch, this court reaffirmed an earlier decision in which we declined to hold moot a challenge to a pretrial detention statute, although appellant entered pleas of guilty and was no longer held under the statute. United States v. Edwards, 430 A.2d 1321, 1324 n. 2 (D.C. 1981) (en banc), cert. denied, 455 U.S. 1022, 102 S.Ct. 1721, 72 L.Ed.2d 141 (1982). The facts presented here are somewhat analogous to those presented in Edwards. In Edwards, appellant challenged his detention under a pretrial detention statute (D.C.Code § 23-1322 (1973)). We concluded that the limited time for pretrial detention brought the case within the mootness exception. Edwards, supra. The same rationale persuades us that the issue raised here on appeal is appropriate for review.
The District argued in its brief that W.L. could not reasonably be expected to be again in a status which would preclude his placement with adjudicated delinquents because the government planned to file a new CINS petition when W.L. returned to custody. Thus, appellee reasoned, any future order for W.L.'s detention at the Receiving Home would be within the purview of either D.C.Code § 16-2313(b)(3) (which specifically authorizes the detention of CINS children in a facility for delinquents provided they are not commingled) or D.C.Code § 16-2320(d) (which authorizes such a placement for children who previously have been found to be in need of supervision). Indeed, this court was notified after argument that W.L. has since been adjudicated delinquent. Thus, as to W.L., any prohibition of his future detention with other delinquents has been eliminated. However, the limited time that a child remains in the Receiving Home while awaiting placement in a foster home or an institution prevents full litigation of the issue before cessation of the challenged action. The presence of this factor warrants disposition of the issue on the merits. See In re Morris, 482 A.2d 369, 372 (D.C.1984) (the question whether emergency hospitalization was lawful was not rendered moot by change in patient's status to voluntary and subsequent discharge). Therefore, we hold that appellant's case is not moot.
The trial court's order was premised on the conclusion that the controlling statute authorizes placement of a CINS child at the Receiving Home provided the child is not commingled with adjudicated delinquents. Appellant argues that although D.C.Code § 16-2313(b)(3) so provides, a separate statutory provision precludes placement of *842 CINS children in such facilities unless there is a second CINS adjudication. The section of the Code appellant relies upon reads as follows:
No child found in need of supervision, unless also found delinquent, shall be committed to or placed in an institution or facility for delinquent children; except that if such child has previously been found in need of supervision and the Division, after hearing, so finds, the Division may specify that such child be committed to or placed in an institution or facility for delinquent children.
D.C.Code § 16-2320(d) (1989).
A statute must be interpreted consistent with its plain meaning when its language is clear. Peoples Drug Stores v. District of Columbia, 470 A.2d 751, 753 (D.C.1983) (en banc). The foregoing statutory provision does not state clearly that a second CINS adjudication is a prerequisite to a CINS child's placement in a facility for delinquents. Where the statutory language is ambiguous or otherwise unclear, we look to the legislative history for guidance in interpreting it. Id. at 754. We find that there is also some ambiguity in the legislative history of this section of the Code.
The history of § 16-2320(d)[6] explains the meaning of, and rationale for the provision as follows:
Also, the Senate District Committee has revised the provision in subsection (d) of proposed section 16-2316, District of Columbia Code, so as to implement the precise recommendation of the HEW Guide. Under the bill as reported a child found to be in need of supervision may at the outset be confined along with other such children only. The bill as introduced permitted the court to direct that such a child at the outset be confined with delinquents; but under the revised provision confinement with delinquents can be ordered only when the child's conduct in an institution or otherwise under treatment with others in his category in fact proves to be unsatisfactory. The reasoning approved by the committee in this regard is that, if confinement as a delinquent is appropriate at the outset, then a delinquency petition should be brought.
S. REP. No. 620, 91st Cong., 1st Sess. 7 (1969). This explanation seems to suggest that although the original disposition order cannot provide for the child's placement in a facility for delinquents, such a placement can be ordered if the child's conduct proves unsatisfactory in the facility designated initially. Id. However, the summary for the provision, which appears later in the report, states:
A child found to be in need of supervision cannot be placed in an institution or facility for delinquents unless he is also found delinquent, or unless he is alleged and found to be in need or (sic) supervision a second time and the Division specifically orders his commitment to an institution or facility for delinquent children.
Id. at 24. The interpretation that a second CINS adjudication is required before a child can be placed in a facility for delinquent children is supported by the foregoing section of the legislative history. Also providing support for this interpretation is the statement in the earlier section of the legislative history that § 16-2316(d) was intended to "implement the precise recommendation of the HEW Guide." Id. at 7. Both the comparable model section in the referenced document and the comment to it specify that only if the child "is again alleged to be in need of supervision and the court, after hearing, so finds" can the child be placed in a facility established for the care of delinquent children.[7] In spite of the less than clear language of the statute and conflicting intentions expressed in the legislative history, we are persuaded by the *843 summary of the provision contained in the legislative history, the expressed intention of Congress to implement the HEW Guide and the explanation and model language in the HEW Guide that the D.C.Code § 16-2320(d) must be read to require a second CINS adjudication before a child previously adjudicated a CINS can be placed at a facility for delinquent children. We so hold.
The above analysis does not lead to the conclusion that the trial court's order for temporary detention of W.L. at the Receiving Home was reversible error. The record reflects that the Receiving Home is not a facility maintained for adjudicated and committed delinquent youths, although due to judicial orders, half of the population was in that status on the date of W.L.'s hearing. The trial judge imposed the requirement of strict segregation of W.L. from any adjudicated delinquents. The trial court's order complies with the statute in that it placed W.L. in a facility designed, and generally used for detained youth prior to trial and imposed strict conditions for separation of W.L. from any delinquents held at the facility. It is not the court's order, but the District's implementation of it which may be subject to challenge. If the District of Columbia complies with the Order and maintains its CINS children in separate parts of the Receiving Home, then the requirement of the statute and the court's order will be effectuated. If it does not, then enforcement can be sought through civil contempt. D.D. v. M.T., 550 A.2d 37, 44 (D.C.1988). Civil contempt is the appropriate means to compel compliance by the District with the court's orders aimed at assuring proper treatment and rehabilitation of juveniles. See District of Columbia v. Jerry M., 571 A.2d 178, 192 (D.C.1990). Therefore, the order of the trial court of June 14, 1990 must be affirmed.
Our concurring colleague raises an issue which we view as no less important than he, but which we do not find to be squarely presented on the record before us. That issue is whether W.L.'s placement at the Receiving Home was improper because the facility could not provide the care and rehabilitation to which he was entitled. In the notice of appeal, appellant set forth the issue presented this way: "[w]hether a child found to be a person in need of supervision may be held at Receiving Home pursuant to D.C.Code § 16-2320(d)." The issue framed and argued in appellant's Motion for Summary Reversal, relied upon in lieu of a brief on the merits, is posed similarly. In a reply brief, appellant argues only the mootness issue and that W.L. did not fall within the statutory exception to D.C.Code § 16-2320(d), which allows a child twice found to be in need of supervision to be placed in a facility for delinquents.
Appellant's Motion for Summary Reversal does include a summary paragraph which refers to the inappropriateness of the placement given W.L.'s rehabilitative needs.[8] We do not regard this reference, made without briefing, as providing a basis for this court to decide whether the trial court erred in placing W.L. temporarily at the Receiving Home because of the lack of programs to meet his individual needs. Nor has appellant raised on appeal the trial court's failure to conduct a further inquiry to determine whether the conditions at the facility (other than those involving commingling with adjudicated delinquents) violated the statute. See Fulwood v. Stone, 129 U.S.App.D.C. 314, 319, 394 F.2d 939, 944 (1967).
Initially, appellant summarized the sole argument to the court below as follows:
Mr. [Hastings] Jones: The provision that says that a person in need of supervision shall not be placed or committed to a *844 facility for delinquent children, does apply to W.L. He should not be there!
The Court: Is that your only argument?
Mr. Jones: That is our argument.
It is clear from the record that counsel was referring to D.C.Code § 16-2320(d). Later in the proceeding, W.L.'s counsel requested to call a witness to establish a record of what programs W.L. would receive at the Receiving Home. Based on representations from Mr. Hoffman, a representative of Social Services at the Receiving Home, the trial judge concluded that W.L. was given some opportunity to interact with other CINS children, and she declined to hold an evidentiary hearing on the matter at that time. The trial judge pointed out that the issue for purposes of the hearing was not whether W.L. was receiving ideal resources during the temporary placement at the Receiving Home pending location of a proper facility. Rather, the judge observed:
The issue is where can he be where he is safe so that we can find a placement where he can get the care and rehabilitation that he needs that is the issue.
Appellant did not pursue the issue, and the reason is understandable. The order appealed from was entered on June 12, 1990, and provided for only temporary placement of W.L. at the Receiving Home until his next court hearing on August 13, 1990. The trial court concluded that this temporary placement was necessary to assure W.L.'s continued availability for completion of testing[9] and location of a new residential placement which could meet his rehabilitative needs. The trial judge also expressed concerns for the child's security in the interim. W.L., a thirteen year old, had a history of abscondences from custody, including one during which he was missing for two months. A report prepared by the social worker for the review hearing on June 12, 1990, showed that W.L. had been arrested on May 10, 1990 in Montgomery County, Maryland on allegations that he attempted to sell sixty dollars worth of "crack cocaine" to an undercover police officer. The trial court recognized its obligation to secure for W.L. a placement where he could receive care, education and rehabilitation. The order appealed from and the order for testing entered that same date appear to have been reasonably necessary to accomplish that objective.
The court deferred for consideration at the next hearing, (scheduled in August 1990 prior to commencement of the customary fall school term) questions related to the minor's adjustment and program participation at the Receiving Home. The trial judge expected that efforts to place the child would be expedited, that he would get some program participation in the meantime, and that the parties could schedule an immediate review if circumstances required it before the next hearing.[10]
We recognize that a court hearing juvenile proceedings has a responsibility to make an appropriate inquiry where a substantial complaint is made that a committed child is not receiving the care he needs. Even where the child is in an interim placement, rather than a permanent one, there may be circumstances (e.g., where there is an immediate need for treatment) which require such an inquiry. Creek v. Stone, 126 U.S.App.D.C. 329, 334, 379 F.2d 106, *845 111 (1967). However, the circumstances presented to the court below did not trigger such an inquiry, and appellant does not claim otherwise on appeal. For all of the foregoing reasons, we do not reach the issue addressed in the concurring opinion.
Accordingly, the order of the trial court of June 14, 1990 hereby is
Affirmed.
SCHWELB, Associate Judge, concurring in the result:
This case concerns an example of shocking deprivation and degradation in the capital of the richest nation on earth. It presents the court with the juridical equivalent of Catch-22. An obviously conscientious and thoughtful trial judge[1] was attempting to do her best for a most unfortunate youngster[2] under circumstances in which no acceptable option was available.[3] I do not think that what Judge Winfield ordered was consistent with the parens patriae doctrine as those who designed it would have wanted it to work. Unfortunately, however, I have no constructive suggestion as to what the judge ought to have done or even could have done. Accordingly, I vote to affirm her order.

I
Although the trial judge and my colleagues in the majority have focused primarily on the question whether there has been compliance with the statute mandating segregation of juveniles in need of supervision (sometimes known as PINS or CINS) from adjudicated delinquents, that is not the only issue in the case. Both in the *846 trial court[4] and on appeal,[5] W.L. contended that his detention at the Receiving Home, which unsurprisingly lasted a total of more than four months, did not provide him with the care and rehabilitation to which he was entitled pursuant to legislation which protects juveniles in this jurisdiction. On this record, he seems to me to have a point.
The District of Columbia is firmly committed to a rehabilitative approach to the problems of errant juveniles. In re L.J., 546 A.2d 429, 437 (D.C.1988); see Kent v. United States, 383 U.S. 541, 554, 86 S.Ct. 1045, 1053, 16 L.Ed.2d 84 (1966). "[w]hen a child is removed from his own home, the [Family] Division [of the Superior Court] will secure for him custody, care and discipline as nearly as possible equivalent to that which should have been provided for him by his parents." Super.Ct.Juv.R. 2.[6] This means, among other things, that a detained juvenile is entitled to receive educational instruction comparable to that afforded to children in the community, as well an opportunity for reasonable exercise and recreation. In re Savoy, 98 Daily Wash.L.Rptr.1937, 1940-41 (Super. Ct.D.C.1970) (Greene, C.J.) (Savoy I). When presented with a substantial complaint regarding the conditions of detention, the trial court has a duty "to make an appropriate inquiry to insure that the statutory criteria, as applied to that juvenile, are being met." Fulwood v. Stone, 129 U.S.App.D.C. 314, 319, 394 F.2d 939, 944 (1967) (citations and internal quotation marks omitted).
The results of the inquiry conducted by the trial judge in this case were not reassuring. Despite sincere efforts on the part of the officials of the Department of Human Services responsible for the facility,[7] it was obviously impossible to provide W.L. with meaningful rehabilitation while he was confined there.
Mr. Neal Hoffman, a representative of the Receiving Home, appeared at a hearing in which the judge reviewed the conditions of W.L.'s commitment. The hearing took place three weeks after W.L. was placed at the Receiving Home. Mr. Hoffman explained that at the time of the hearing, W.L. was one of a total of four PINS children being held at the facility. Mr. Hoffman stated that the court orders regarding the other three children did not require that they be segregated, "and we have not taken it upon ourselves to separate them because it is important from a treatment standpoint to have the youngsters in the Receiving Home participate in all of the activities that go on." W.L.'s situation, however, was different:

*847 We are segregating W. because W. has an order for segregation. . . . . The other ones[[8]] are more a part of our total program. It is W. that is, indeed, being segregated.
No further description was provided of the recreation in which W.L. was being allowed to participate.
The record is also somewhat confusing with respect to W.L.'s schooling. Mr. Hoffman remarked that
We can't separate them in school. I did not mention school. He goes to school with everyone.
The judge interjected that "he is not supposed to," and Mr. Hoffman explained that "an awful lot of our treatment program [consists of] group activities. They are group activities as far as our therapy." After complimenting Mr. Hoffman on his efforts, the judge ruled that
W. can't go to a classroom with delinquent kids. He cannot go to a classroom with anything else other than PINS kids. Now, I'm not asking you to run two schools, as fine a school as you are running now. I'm simply saying that this child, and as an aside now, the other committed PINS kids, cannot be commingled with the delinquent.
She added that "this is a real tough road for you to walk."
Acknowledging that "we can't run two schools," Mr. Hoffman suggested that "in the interests of W., if he is placed at the Receiving Home, we think that he could benefit from the full program that we would have to offer." When the judge replied that "I don't have any choice," Mr. Hoffman suggested that W.L. be transferred to a PINS facility pending a permanent placement. The judge declined to accept this suggestion because she apprehended that W.L. would flee and that harm would come to him. See supra, n. 1.
The extent of the schooling and recreation available to W.L. at the Receiving Home is not entirely clear from the foregoing discussion. The judge later indicated her understanding that "he is getting some ability to go to school[[9]] [and] some ability to recreate with some other PINS children." W.L.'s counsel requested that Mr. Hoffman be asked to testify on the record with respect to what W.L.'s program at the Receiving Home was to be, but the judge responded that there was no reason for receiving such testimony because "W is not being locked in his room [with] somebody shoving a plate of food under his door three times a day."
In any event, Mr. Hoffman was obviously of the opinion that W.L. was not receiving the benefits of the Receiving Home's treatment program. The reasons are obvious. To the extent that the youngster was segregated from other residents, he could not participate in rehabilitative activity. To the extent he was permitted to participate in such activity, there was less than strict compliance with the requirement that he be segregated from adjudicated delinquents. Mr. Hoffman thus found himself between a rock and a hard place in attempting both to segregate W.L. from delinquent children and to provide him with rehabilitative services. As a result of his placement at the Receiving Home, W.L. was not only at a facility which, as Mr. Hoffman explained, was supposed to be a short-term facility for detained youth awaiting trial, but also was not receiving most of such services as were available at that facility.
Although, as I have indicated, the Receiving Home was supposed to be used for juveniles awaiting trial, Mr. Hoffman represented to the court that approximately half of the residents at the time of the review of commitment on June 12, 1990 were committed children, most of them adjudicated delinquents. This surely exacerbated the problems of a facility which had already been the subject of unfavorable judicial commentary in past years. See *848 Creek v. Stone, 126 U.S.App.D.C. 329, 379 F.2d 106 (1967); Savoy I, supra. Two years after his withering exposé in Savoy I of conditions at the facility, former Chief Judge Greene, finding that little progress had been made, ordered that the Receiving Home be "closed except that it may continue to be used as a temporary holding facility for [48 hours]." Savoy II, supra, 101 Daily Wash.L.Rptr. at 321. This came to be known as the 48-hour rule, and for many years juveniles were not to be held at the Receiving Home for longer than that in the absence of consent or emergency circumstances. We were advised at argument that the Savoy order is no longer in effect, but it is obvious that widespread use of the Receiving Home as a place of detention for committed delinquents as well as for pretrial detainees creates severe logistical problems and makes it difficult to ensure the full enjoyment by detained juveniles of their right to meaningful rehabilitation.
In any event, W.L.'s assignment to the Receiving Home meant that he could either be segregated from the delinquent population (in which case he would be precluded from participating in much of the rehabilitative activity) or be permitted to participate in such activity (in which case he would not be segregated).[10] Moreover, W.L. was not at the Receiving Home for "a couple of weeks," as Judge Winfield had hoped, but another four months. This was hardly a surprise, for the judge was fully aware of the difficulties which would be encountered in securing a suitable placement for W.L. I do not believe that his placement in the Receiving Home, for a period that predictably and actually turned out to be quite substantial, can readily be reconciled with the rehabilitative legislation which was designed to protect the rights of delinquent children and those in need of supervision. W.L.'s need was acute, but he received little if any rehabilitation.

II
Recitation of the shortcomings of W.L.'s placement at the Receiving Home, however, could do little to improve his circumstances unless a plausible alternative was available. See n. 1, supra. As the judge repeated on a number of occasions, she was not aware of such an alternative. Having sat where she sits, I can appreciate her point.
Judge Winfield was attempting to secure for W.L. a second residential placement. He had previously absconded from the first. With his prospects for foster care dim and his record to date alarming, it would not be easy to secure his acceptance at an appropriate institution. The question before the judge was where W.L. should be during the search for such a placement.
There are no "secure" PINS facilities in the District of Columbia. The only available alternative to detention, either at the Receiving Home or at the Children's Center, would have been a placement in the community, either with a relative or at a nonsecure facility. Judge Winfield apprehended that if W.L. were at liberty, he would "run" once again and would not be available for the testing and other measures which are necessary in order to secure a residential placement. Based on W.L.'s record of abscondence, the judge's apprehension was eminently reasonable. Given the unspeakable experiences to which the boy had been exposed during his chaotic life, release into the underworld of the streets might well have meant death[11] or destruction.
Arguably, W.L. may not lawfully be held at the Receiving Home unless his care in that facility substantially conforms to the statutory requirements. Savoy I, supra, 98 Daily Wash.L.Rptr. at 1937, 1944, and *849 authorities there cited.[12] "[A] `receiving home' ... for juveniles is an institution of confinement in which the child is incarcerated for a greater or lesser time." In re Gault, 387 U.S. 1, 27, 87 S.Ct. 1428, 1443, 18 L.Ed.2d 527 (1967). W.L.'s liberty was at stake, and the District's authority to restrict that liberty imposed a corresponding obligation to adhere to applicable rehabilitative standards. W.L. had "a legal right to a custody that is not inconsistent with the parens patriae premise of the law." Creek, supra, 126 U.S.App.D.C. at 334, 379 F.2d at 111.[13]
There must surely, however, be some common sense limitation to the reach of this beguiling but somewhat academic proposition. A murderer cannot win his release from prison by proving that the conditions of his confinement do not meet minimal constitutional standards. Although the analogy is an imperfect one, I conclude that the apparent violation of W.L.'s statutory rights does not mean that the judge was required to release him from secure custody. Setting W.L. at "liberty" would have exposed him to the probability of even greater harm on those mean streets of our city where crack is king and its purveyors resort to UZI's and other instruments of violence to consign their victims and rivals to a premature and improvident doom. In my opinion, aside from the somewhat academic nature of the present inquiry,[14] reversal of the judgment would bring W.L. the kind of "pyrrhic victory," In Re Melton, 565 A.2d 635, 649 (D.C.1989) (dissenting opinion), rev'd, 597 A.2d 892 (D.C.1991) (en banc), which he might well "enjoy" only from the grave. Accordingly, I join my colleagues in voting to affirm.
NOTES
[1] When a child is committed restrictively to the custody of the governmental agency, the court retains jurisdiction to determine release and placement of the child. See D.C.Code § 16-2322(a)(1) (1989) and In re L.J., 546 A.2d 429, 436 (D.C.1988).
[2] See Super.Ct.Juv.R. 9(a) and (b)(2).
[3] The trial court recounted the history of the child's abscondences from custody.
[4] Mr. Hoffman admitted that the other two CINS children who were not under similar segregation orders, were not as strictly separated from the adjudicated delinquents as W.L.
[5] A further complication was presented at oral argument when the court was informed that W.L. had just absconded from the group home, raising the issue whether on this ground alone, we should decline to hear his appeal. See In re S.H., 570 A.2d 814, 816 (D.C.1990) (appellate court acts within discretionary powers in refusing to hear appeal once appellant absconds). We have determined to proceed given, inter alia, W.L.'s subsequent return to custody, the basically noncriminal nature of a CINS proceeding and the quasiclass action aspect of this appeal.
[6] This section is identified in the legislative history as § 16-2316(d).
[7] U.S. DEPARTMENT OF HEALTH, EDUCATION AND WELFARE, CHILDREN'S BUREAU LEGISLATIVE GUIDE FOR DRAFTING FAMILY AND JUVENILE COURTS ACT 37-38 (1969).
[8] The paragraph referred to reads as follows: The above analysis of the relevant statutory language and legislative history demonstrates clearly that the trial court erred in confining W.L. at the Receiving Home with committed delinquent children, and that his continued detention is both illegal and highly inappropriate in light of his distinct rehabilitative needs that the legislature has recognized and provided for by specific enactment.
[9] The trial court entered a second order on June 12, 1990 for an educational assessment, psychiatric, psychological and physical examinations which were required for a new residential placement.
[10] The following excerpts from the judge's comments make the point:

He will not get the benefit of all of the programs, but he is allowed to commingle with pre-adjudicated alleged delinquents, and the other PINS children. And, Mr. Jones, frankly, you are not going to persuade me that the next couple of weeks at the Receiving Home are going to destroy W.'s ability to be cared for and rehabilitated.
* * * * * *
What I propose is that we continue the review for eight weeks, giving Mr. Carroll time to get their evaluations done, to get the applications out and to get some results. If you're satisfied that we need a review before that eight weeks is up because something awful is happening to him or because some alternative has come up, I will be glad to hear it.
[1] Judge Winfield's empathy for the situation in which her young ward found himself is reflected in her comments about what made him tick:

He just ran from court last time. Now, why would W. stay at Stanton Road when he knows that when we place him again, we can't get him a home visit. That has been the problem all along. W. is a very angry, very frustrated child because the world of adults will not get him a single set or even, frankly, a single caring adult that he can come visit. That makes him angry as well he should be.
So when he comes to court and every single time I act like I care about him and I try to find out how he is doing. And he says, but can I come home for Thanksgiving or for Christmas. Can you just give me a place to come home to. And, I say, I can't get you one. Then he runs. And anybody would.
So, I can't put him in a situation where he is going to run at 13. If he was close enough to the age I think I'd frankly just blink it, let him go ahead. But, not at this age. I can't let him be in the streets at 13 years old, as angry as he is for the reasons that he is angry.
[2] To say that W.L. needs help badly is to understate the acuteness of his circumstances. According to a social study attached to the District's brief, he was sexually molested by his father, resulting in "sexual trauma," and neglected by his mother, who apparently also encouraged him to sell drugs. There is evidence that he was also sexually molested at one of his foster homes. Both of his parents are apparently members of the drug underworld that haunts our city, and they live in the streets. W.L. has been arrested on three occasions, all for distribution of cocaine or possession of cocaine with intent to distribute it. The first arrest, allegedly arising out of W.L.'s possession of 43 packages of crack cocaine, occurred two weeks after his eleventh birthday. W.L. told his social worker, however, that he began selling PCP at the age of seven!
[3] The judge addressed the following comments to the defense attorney, who had suggested foster care placement for his peripatetic client:

THE COURT: No, sir, you offered a two weeks stay in the community. If he was there at the end of two weeks, we could find out if a foster parent would take him. And I said, no. That is all you offered me.
MR. JONES: That is all I know to be available.
THE COURT: All right. Then while I'm using what is available you are free, because that is your job as his lawyer, to say how terrible it is, to spend a lot of time in the courtroom talking about how awful it is. It doesn't help W. a lot to have you do that. And I know it is your job. And it doesn't change the fact that I have no choices. And I have no choices.
If somebody gives me the DHS budget, watch me make a choice for W. But, I don't have that budget. I don't run that shop. And the people that run it can't create a foster home out of none. And there are a lot of foster parents, many of whom are older, and they don't want a teenage boy with the kind of history that W. has got, unfortunately.
We put him in residential treatment hoping that we can give him the kind of counselling that would keep him at least still so that we can find a foster home, so he won't make his life so miserable there.
[4] asserts, in further support of this motion that his detention at the Receiving Home has not and will not achieve the goal of proper care and rehabilitation and is not an appropriate facility for children in need of supervision as required under D.C.Code sec. 16-2313(b). As this Court has recognized in orders and opinions, the Receiving Home is `obsolete, inadequate and beyond restoration...' See In the Matter of Savoy, 98 [Daily] Wash.L. [Rptr.] 1937, 1943."
Respondent's Application for Reconsideration of Order of Detention, at 6.
[5] Hoffman, the director of Social Services at the Receiving Home, informed the court on June 12, 1990, that approximately half of the population of Receiving Home is currently comprised of committed delinquent children, and that there are no separate educational or therapeutic facilities for PINS children."
Appellant's Motion for Summary Reversal, at 3.
[6] The quoted language from Rule 2 used to be a part of our statutory law. D.C.Code § 16-2316(3) (1966). It was omitted, however, from the 1970 edition. See In re An Inquiry into Allegations of Misconduct Against Juveniles Detained at and Committed at Cedar Knoll, etc., 430 A.2d 1087, 1091 (D.C.1981). The court "assumed" in that case, without deciding, that the standard in Rule 2 is identical to the former statutory one. Id. Although, in the absence of a statute, such policies are not usually adopted by court rule, this one has become part of the warp and woof of our law, see Creek v. Stone, 126 U.S.App.D.C. 329, 334, 379 F.2d 106, 111 (1967) (per curiam), and ought to be retained in it. "While the language of the statute has been altered since 1970, its meaning remains the same." In re Savoy, 101 Daily Wash.L.Rptr. 317 (Super.Ct.D.C.1973) (Savoy II).
[7] Judge Winfield told Mr. Neal Hoffman of the Receiving Home that

You are doing the right thing. You are trying to help the children you have. You are trying to treat the children that you have. The law superimposes upon you this obligation to segregate the PINS kids. So you can't do both. You cannot treat all of them in a classroom.
[8] This reference appears to be to the other three PINS children.
[9] The basis for this observation is unclear, for the judge had directed Mr. Hoffman not to permit W.L. to attend school with delinquent children and Mr. Hoffman had indicated, and the judge had agreed, that the Receiving Home could not operate two schools.
[10] Judge Winfield acknowledged that "W.L. will not be getting the benefit of all the programs," but told his counsel that "you are not going to persuade me that the next couple of weeks at the Receiving Home are going to destroy W's ability to be cared for and rehabilitated."
[11] W.L. told the social worker that he "knew of friends who have been shot and robbed by the stick-up boys." He said he avoids the "stick-up boys" by leaving the drug strip at a certain time. Concerns about his safety were real and immediate rather than empty rhetoric.
[12] "The Court hereby expressly determines the Receiving Home not to be an `appropriate' facility within the meaning of D.C.Code § 16-2313(b), except for the uses specified above, and it is `designated' by the Court as a `detention home for allegedly delinquent children' only for those uses." Savoy II, supra, slip op at 15. Although the Savoy order has apparently expired, the present record suggests that former Chief Judge Greene's comments remain relevant in 1991, at least for children in W.L.'s unfortunate circumstances.
[13] Creek involved a juvenile's detention at the Receiving Home pending trial, presumably for a significantly shorter period than was at issue here. The court held that the statute now embodied in Super.Ct.Juv.R. 2, see page ___ and n. 6, supra, required an inquiry whether the juvenile was being denied proper psychiatric care and treatment.
[14] W.L. is no longer at the Receiving Home, and it is somewhat questionable whether the unusual situation in his case is likely to be repeated. Nevertheless, I am prepared to "go along" with my colleagues' holding that the case should not be dismissed as moot.