661 A.2d 1086 (1995)
In re T.R.J., Appellant.
No. 92-FS-772.
District of Columbia Court of Appeals.
Argued April 20, 1994.
Decided June 29, 1995.
*1087 Joseph B. Tulman, Washington, DC, for appellant.
Mary L. Wilson, Asst. Corp. Counsel, with whom John Payton, Corp. Counsel at the time the brief was filed, Charles L. Reischel, Deputy Corp. Counsel, and Lutz Alexander Prager, Asst. Corp. Counsel, Washington, DC, were on the brief, for appellee.
Before WAGNER, Chief Judge,[*] TERRY, and SCHWELB, Associate Judges.
WAGNER, Chief Judge:
This is an appeal from an order of the trial court terminating the commitment of T.R.J. as a neglected child to the Department of Human Services (DHS) after he reached his eighteenth birthday, but prior to his twenty-first birthday.[1] The case presents an issue of first impression, i.e., whether the best interest of the child standard applies where the government seeks to terminate the commitment of a neglected child because it concludes that the child cannot make effective use of the services provided in the juvenile system. Appellant, T.R.J., argues that the trial court erred in terminating the commitment without considering whether the termination was in his best interest and necessary to safeguard his welfare. He contends that the court erred in terminating the commitment where his basic needs for food, shelter, education and mental health care remained unmet. He also argues that reversal is required because he was deprived of a full evidentiary hearing on the issue of termination. It is the government's position that the court has the authority to terminate the commitment of a neglected child when the record demonstrates that neither the minor child nor the public will benefit from the child's continued commitment and supervision by the court. We hold that when the Superior Court has acquired jurisdiction of a neglected child and committed that child for care to the public agency responsible for the care of neglected children and is requested to terminate the child's commitment prior to his or her twenty-first birthday, it must first find that commitment is no longer necessary to safeguard the child's welfare and should frame that finding in conformity with the statute in terms of the child's best interest.[2] D.C.Code §§ 16-2323(d) & -2320(a).[3]

I.
T.R.J. has now reached his twenty-first birthday, which raises preliminarily the question of mootness. Since the Family Division of the Superior Court retains jurisdiction of a child only until he reaches his twenty-first birthday, T.R.J. may no longer avail himself of the services provided through the juvenile court system. There is an exception to the mootness doctrine which the Supreme Court has confined, absent a class *1088 action, essentially to situations where: "`(1) the challenged action was in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there was a reasonable expectation that the same complaining party would be subjected to the same action again.'" In re W.L., 603 A.2d 839, 841 (D.C.1991) (quoting Weinstein v. Bradford, 423 U.S. 147, 149, 96 S.Ct. 347, 349, 46 L.Ed.2d 350 (1975)) (citing Sosna v. Iowa, 419 U.S. 393, 95 S.Ct. 553, 42 L.Ed.2d 532 (1975)). This court has not adhered strictly to Weinstein's formulation of the mootness rule. See W.L., 603 A.2d at 841; Lynch v. United States, 557 A.2d 580, 582 (D.C.1989); United States v. Edwards, 430 A.2d 1321, 1324 n. 2 (D.C.1981) (en banc), cert. denied, 455 U.S. 1022, 102 S.Ct. 1721, 72 L.Ed.2d 141 (1982). Instead, we have held that "[t]he quasi-class action nature of a case, while a factor to be considered in a mootness challenge, is not a necessary condition to deciding an issue." W.L., 603 A.2d at 841. We have held the mootness exception applicable where an issue is capable of repetition yet evading review because of the limited time period between the challenged action and the time that it could be fully adjudicated, whether or not it could again affect the same party. See id. (issue not moot because of the limited time a child remains in Receiving Home while awaiting foster home placement); Edwards, 430 A.2d at 1324 n. 2 (limited time period for pretrial detention renders confinement under the statute a practice "capable of repetition, yet evading review").
In this case, after offering or providing T.R.J. with many different services without success, the court determined, after he reached his eighteenth birthday, that DHS had reached its limit on what it could "be expected to provide and spend on any one respondent at the expense of countless other children with problems equally compelling." Therefore, the court terminated T.R.J.'s commitment, according to T.R.J., at a critical time when he had no family support and was "homeless, uneducated, and emotionally disturbed." Thus, he contends, he was cast adrift, ill prepared to make the transition into independent adult living by a system which intervened in his life to assure that he had the proper care for his physical, mental, and emotional health. It is quite likely that other young people who flounder in the juvenile neglect system may face the same prospects as they near the age for termination of the court's jurisdiction and that the obligation of the government for their continued care cannot be fully litigated before they become age ineligible. For this reason, we conclude that the mootness exception applies and supports the efficacy of our review of the issue in this case. We turn then to consideration of the factual context in which the questions arise.

II.
Appellant, T.R.J., and his two siblings were adjudicated neglected on January 21, 1988 under the provisions of D.C.Code § 16-2301(9)(B) based on a stipulation signed by their mother.[4] The neglect petition alleged that T.R.J. had left his mother's care and was residing with homeless people at the Capital City Inn and that his mother, who was mildly mentally retarded, was unable to discharge her responsibilities to him. T.R.J.'s mother signed a stipulation stating that she had been diagnosed as learning disabled and by reason thereof, she was dependent upon her great aunt, D.M., with whom she resided. The mother stipulated that because of her own limitations, she was unable to provide proper parental care or control for her children and that she could not avail herself of community services because D.M. refuses to allow intervention in her home. According to the stipulation:
[T.R.J.] has been diagnosed as an emotionally handicapped adolescent. [T.R.J.] was often out of the house, wandering the streets late at night. Eventually, he got into trouble for alleged[ly] breaking and entering a vending machine.
T.R.J.'s father was deceased.
On December 8, 1988, the trial court entered a dispositional order committing T.R.J. *1089 to the care and custody of DHS for two years. T.R.J. was fifteen years old at that time. Thereafter, the court entered orders extending the commitment annually pursuant to D.C.Code § 16-2322, including one entered on December 20, 1991, which extended the commitment through March 1, 1993.[5] However, prior to the expiration of the last such order, the Corporation Counsel made an oral motion for termination of T.R.J.'s commitment at an emergency neglect review on March 12, 1992. The trial court granted the motion over T.R.J.'s objection and denied T.R.J.'s motion for reconsideration.
Various services and placements were ordered for T.R.J. once the court acquired jurisdiction of him, but he did not fare well in most of them. Initially, T.R.J. was placed in shelter care in the third-party custody of Ms. L., who was residing with her family in a shelter. The predisposition hearing report of the social worker indicates that although this was T.R.J.'s placement of choice, he continued to be truant from school, did not attend family therapy sessions at D.C. General Hospital, and had little contact with his mother or siblings. The social worker remarked that "[i]f placed in individual therapy, it is believed that [T.R.J.] will not participate unless highly motivated and his environment is highly structured." In its disposition order of April 15, 1988, the court again placed T.R.J. in the home of Ms. L. and ordered that he be enrolled in the For Love of Children Learning Center (FLOC). This placement proved to be inadequate, and on June 6, 1988, the court placed T.R.J. in the custody of DHS and ordered that he be placed at the Arkansas Boys and Girls Group Home and referred for family counseling. The court's order also provided that DHS could transfer T.R.J. to the Community Advocates for Youth Program (CAY) and consider residential placement options. Group home placement was terminated because of T.R.J.'s behavioral problems, and he was sent to another group home from which he absconded. On December 8, 1988 the trial court transferred T.R.J.'s legal custody to DHS and ordered it to seek placement for him in FLOC.
T.R.J. lived at various places during 1989, and the court issued custody orders for his return. On March 1, 1990, the court ordered DHS to refer T.R.J. to the Residential Review Committee, which is responsible for securing residential placements. It appears that T.R.J. delayed the residential placement process by failing to come for required evaluations. The record indicates that T.R.J. was not present for an intermediate review on September 27, 1990, and the court scheduled another hearing for February 12, 1991 and ordered that "DHS shall take no further action prior to further order of this Court." T.R.J. did not attend the next hearing, and DHS recommended that T.R.J.'s commitment be terminated. T.R.J.'s attorney convinced the court to order that he be placed with Ms. A., as a special foster parent once she was approved by DHS. T.R.J. had been placed with Ms. A. temporarily through CAY during the pendency of a delinquency case which was dismissed subsequently.
By the time of the next hearing on April 25, 1991, DHS had not done the required home study for approval of Ms. A. as a special foster parent. Nevertheless, Ms. A. continued to maintain T.R.J. in her home. The court ordered DHS to complete the home study and all requirements for Ms. A.'s approval by May 16, 1991. The court also ordered DHS to refer T.R.J. for psychological and physical examinations and to the Residential Review Committee.
By the time of the next hearing in June 1991, Ms. A. had been approved, but T.R.J. refused to live with her because he feared for his safety in her neighborhood because he had incurred a debt which he could not repay. T.R.J. was living in a group home run by the Institute for Behavioral Resources, Inc. (IBR), but he was asked to leave because of noncompliance with IBR's rules. T.R.J.'s attorney informed the court that DHS had not completed the required testing for residential placement, while DHS countered that it was impeded in that effort by *1090 T.R.J.'s failure to cooperate. The trial court instructed DHS to complete the tests and to attempt to secure residential placement.
At the time of the review hearing on September 10, 1991, T.R.J. had been spending time at his mother's house, but she wanted him to leave. She claimed that he was misbehaving, causing a strain on her marriage, and failing to contribute. Although T.R.J.'s mother suggested that commitment be terminated, the court stated that in light of a psychological report submitted by T.R.J.'s attorney, "there is no way in the world I could possibly do that now." The report indicated that T.R.J. had an above-average intellect, but he suffered from pathological adolescent depression, had experienced strong suicidal tendencies, and required intensive psychotherapy. Therefore, the court entered an order requiring DHS to set up psychiatric therapy for T.R.J. It also authorized T.R.J.'s attorney to locate a residential placement for him.
By the time of the next hearing on September 25, 1991, T.R.J. was still living with his mother, but she wanted him to leave because she had no money to provide him with food. The mother indicated that T.R.J. was not eating except when his attorney or the social workers provided the food. DHS contended that T.R.J. would be fed if he went to a DHS facility or to a group home. The court instructed the parties to try to settle the matter and expedite residential placement. Subsequently, DHS temporarily placed T.R.J. in the Randall School emergency intake office; however, his attorney claimed that while there, T.R.J. was not fed adequately, had no changes of clothing, and was unable to take a shower. James Oliver, the Branch Chief of Branch II of Child and Family Services at DHS, represented that no group homes were available to T.R.J. because of his past lack of cooperation and his age. On October 18, 1991, T.R.J. filed a motion for a temporary restraining order seeking immediate placement at the Bennington School in Vermont and for other relief. About the same time, the District filed a motion to terminate T.R.J.'s commitment. The court denied both motions without prejudice. Shortly thereafter T.R.J. went to the Children's Square in Iowa, a facility located by the Residential Review Committee. As of December 20, 1991, all parties agreed that the Iowa placement was progressing well. T.R.J. was cooperating and trying to obtain his GED, and he had jobs in a grocery store and at McDonald's.
However, on February 13, 1992, T.R.J. was discharged from the facility for failing to comply with treatment prescribed by the Children's Square psychiatric facility, where he was placed after a serious altercation. Children's Square recommended that T.R.J. take medication on an inpatient basis at its psychiatric facility, and it would accept him into its Outward Bound program. If he completed the program successfully, he could enter a supervised independent living program. Alternatively, the school proposed an 18-month to 2-year residential program with an alcohol abuse component which might also allow T.R.J. to enter the independent living program. T.R.J.'s guardian ad litem suggested that he be given a stipend to live in Iowa until he stabilized and entered the program. Ultimately, the District and other state governments ceased placing children at this facility. The government contended that they had offered T.R.J. every possible placement and that it could only suggest that he seek voluntary placement at St. Elizabeth Hospital upon termination of commitment.
At a hearing on March 13, 1992, the trial court finally terminated T.R.J.'s commitment. Prior to doing so, the court asked T.R.J. what he was looking for and whether the court should get out of his life. T.R.J. responded:
No. I want a life. I need somebody to help [m]e with my life. I ain't had nobody to care for me since I was a kid, you know, no guidance, no discipline. So how can I just start doing what I've been doing to survive and try to do everything somebody else tells me. It is going to be hard, but I want a life though. I don't want to be afraid or get killed. I don't think I can do it by myself.
The court expressed the view that it had done all that it could for T.R.J. without success. Therefore, the court ordered the commitment to be terminated in seven days, to *1091 allow time for the social worker and T.R.J.'s attorney to direct him to adult services. T.R.J. filed a motion for reconsideration, arguing that termination of commitment was not in his best interest. He also contended that DHS had failed to develop and implement independent living services for him before he was aged out of the system, as required by the decision in LaShawn A. v. Dixon, 762 F.Supp. 959 (D.D.C.1991), cert. denied, ___ U.S. ___, 114 S.Ct. 691, 126 L.Ed.2d 659 (1994). He also reported that the Bennington School in Vermont was willing to take him at that time and that termination of commitment should have been preceded by a written motion and an evidentiary hearing. The court denied the motion for reconsideration.

III.
T.R.J. argues that the trial court erred in terminating his commitment without considering whether it would be in his best interest and whether continued commitment was necessary to safeguard his welfare. He contends that the trial court's repeated extensions of the commitment order were based on findings that T.R.J. was in need of DHS's services and that the subsequent decision to terminate required precisely the contrary finding that commitment is no longer necessary to safeguard the welfare of the child. See D.C.Code § 16-2323(d). The government contends that the trial court acted within its discretion in terminating the commitment because T.R.J. could no longer make effective use of the juvenile system and his commitment was no longer required to safeguard his welfare. It argues that while the child's welfare is the primary focus of the system, the public interest is also an essential consideration. See D.C.Code § 16-2305(c) (petition for neglect must be based on a determination that "action is necessary to protect the community or the interest of the child"). Thus, the government contends that the language of the applicable statutes do not foreclose the Family Division of the trial court from terminating services when it concludes, based on an adequate record, that continuing services have no prospect of being effective.
As T.R.J. points out, there is no specific statutory provision addressing termination of a child's commitment under the precise circumstances presented in this case. However, a provision for termination which is relevant to our consideration appears in D.C.Code § 16-2323(d), which provides as follows:
If the Division finds that the commitment of the child to a department, agency, institution or person other than the parent is no longer necessary to safeguard the welfare of the child, the Division may order:
(1) the child returned to the home and the provision of supervision or other services; or
(2) any other disposition authorized by section 16-2320(a).[6] *1092 Id. (emphasis added). In turn, D.C.Code § 16-2320(a) sets out the various dispositional alternatives available when a child is adjudicated to be neglected. The provision most pertinent to our consideration is that which provides that "[t]he Division may make such other disposition as is not prohibited by law and as the Division deems to be in the best interests of the child...." D.C.Code § 16-2320(a)(5) (emphasis added).
That any decision to terminate the commitment of a child should rest upon the familiar "best interest of the child" standard is consistent with the statutory framework of the neglect statute. "The court's role as parens patriae in neglect proceedings is well established in this jurisdiction and elsewhere." In re J.J.Z., 630 A.2d 186, 193 (D.C.1993), cert. denied, ___ U.S. ___, 114 S.Ct. 1651, 128 L.Ed.2d 370 (1994) (citations omitted). In that role, the court must act to protect the best interest of the child. See id. Such proceedings are initiated to protect the child's best interests where the parent is unwilling or unable to do so. Id. at 193; see also D.C.Code § 16-2301. Following an adjudication of neglect, the court is required to enter a dispositional order, which again, must meet the best interest of the child standard. D.C.Code § 16-2320; In re X.B., 637 A.2d 1144, 1147 (D.C.1994). In light of this standard, which permeates the statutory scheme, and the plain language of the provision providing for termination, we hold that the best interest of the child must be considered when the court acts to terminate the commitment of a child.
It is not clear that the trial court had in mind this statutory framework when ruling on the government's motion to terminate the commitment. The court determined that termination of commitment was appropriate essentially because no other services had been identified for T.R.J. which the court anticipated would work or that T.R.J. would not refuse, considering his prior history. In its ruling denying T.R.J.'s motion for reconsideration, the trial court explained its reasons as follows:
There were no other services that could be provided to [T.R.J.] that he would not refuse.... [A]fter a series of consistent recommendations on the part of the government to terminate the commitment, the court decided that the time had come [to] let [appellant] support himself, particularly since nothing DHS had tried had been effective or, except for short periods, to [appellant's] liking.
The record in this case reveals that nothing that has been done for [appellant] over the years, including foster placements, group homes, and a costly residential placement, has proved effective. DHS is not required to continue to devise ingenious solutions to a troubled respondent's behavioral problems until it finds one that he decides he likes and will accept. There is a limit to what DHS can be expected to provide and spend on any one respondent at the expense of countless other children with problems equally compelling. In the court's judgment, the limit was reached in this case.
This is a youth whom the court recognized to be in need of continuing services. Less than six months before termination, the court was apprised that he had serious mental health problems, including that he suffered from depression, had strong suicidal tendencies and required intensive psychotherapy. At that time, the court recognized that it could not terminate the commitment under the circumstances. Moreover, the court was aware that T.R.J.'s special needs had never been addressed, albeit in part because of his unwillingness and/or inability to cooperate. The record also reflects that some of the fault rests with DHS, which was responsible for his care.
The government argues that when a child no longer needs or no longer can make effective use of the juvenile system, the commitment should end, either by operation of law or by the action of the court, in the exercise of judicial discretion. To support this argument, the government cites several statutory provisions which permit the trial court to withdraw or deny support to a minor which are not pertinent to the facts presented here. These include circumstances involving: (1) a child whose commitment is "no longer necessary to safeguard" his welfare and therefore, can be released from the justice *1093 system (D.C.Code § 16-2324(d)); a delinquent who is not amenable to rehabilitation before reaching majority, who is treated as an adult (D.C.Code § 16-2307(d)); a child who has reached eighteen who is excluded from entry into the neglect system (D.C.Code § 16-2301(3), (9)); and D.C.Code § 16-2303, which provides that "jurisdiction obtained by the Division ... shall be retained until the child becomes twenty-one years of age, unless jurisdiction is terminated before that time." None of these provisions support the government's argument. Here, T.R.J. apparently continues to be in need of support to "safeguard" his welfare because of his mental, emotional, and financial needs; he has not been adjudged delinquent; he was already under the trial court's jurisdiction before he became eighteen; and the trial court's disposition is not one of those enumerated in the statute. See D.C.Code § 16-2320(a)(1-4). It is clear that the interests and safety of the public is a factor in the disposition of a delinquent. See In re L.J., 546 A.2d 429 (D.C.1988). Of course, T.R.J. was a neglected child. Although he was charged with crimes in Iowa, the trial court's decision to terminate his commitment was not based on T.R.J.'s criminal activity. In any event, assuming that the interests and safety of the public are factors for consideration in determining appropriate dispositional alternatives for a neglected child,[7] the statute is framed in terms of the best interest and welfare of the child, and these factors must be addressed directly. See D.C.Code §§ 16-2323(d)(2), -2310(a).
In the hearing and the order denying appellant's motion for reconsideration, the trial court's focus was on T.R.J.'s unwillingness or inability to benefit from the services provided to him by DHS. The court mentioned repeatedly that T.R.J. had been unable to benefit from the services and placements offered him, and other options would be unlikely to succeed. In this regard, in its order, the trial court stated that:
[N]othing DHS had tried had been effective or, except for short periods, to [appellant's] liking.... The record in this case reveals that nothing that has been done for [appellant] over the years, including foster placements, group homes, and a costly residential placement, has proved effective.
The trial court made a sincere effort to find ways to address T.R.J.'s special needs while he was under the court's supervision. Although the court's findings indicate its view that continuing a commitment that had failed to meet T.R.J.'s needs would not serve the public, the trial court did not frame its findings explicitly in terms of the best interests of the child. This court has not previously addressed whether the best interest of the child standard applies where the government seeks to terminate commitment of a neglected child over the age of eighteen years, but under the age of twenty-one years, under the particular circumstances presented here.[8] We now hold that the statute requires *1094 application of that standard. Since the trial court did not use the "best interest" terminology, a remand for clarification theoretically might be appropriate. However, in light of T.R.J.'s present age, remand is not required except to close the case formally. Accordingly, we remand for that limited purpose.[9]
So Ordered.
NOTES
[*] Judge WAGNER was an Associate Judge of this court at the time of argument. Her status changed to Chief Judge on June 14, 1994.
[1] Where jurisdiction of a child is obtained by the Family Division of the Superior Court of the District of Columbia, it "shall be retained by [the court] until the child becomes twenty-one years of age, unless jurisdiction is terminated before that time." D.C.Code § 16-2303 (1989 Repl.).
[2] But see note 7, infra, regarding the public interest factor.
[3] Unless otherwise stated, all D.C.Code references are to the 1989 Repl. volume.
[4] The term neglected child is defined as one "who is without proper parental care or control, subsistence, education as required by law, or other care or control necessary to his or her physical, mental, or emotional health, and the deprivation is not due to the lack of financial means of his or her parent, guardian, or other custodian...." D.C.Code § 16-2301(9)(B).
[5] A dispositional order vesting legal custody of a child in an agency is limited in duration to a period not exceeding two years which may be extended for additional periods of one year upon motion of the department or agency to which the child is committed. D.C.Code § 16-2322.
[6] D.C.Code § 16-2320(a) provides in pertinent part that:

(a) If a child is found to be neglected, the Division may order any of the following dispositions which will be in the best interest of the child:
(1) Permit the child to remain with his parent, guardian, or other custodian, subject to such conditions and limitations as the Division may prescribe, including but not limited to medical, psychiatric, or other treatment at an appropriate facility on an out-patient basis.
(2) Place the child under protective supervision.
(3) Transfer legal custody to any of the following
(A) a public agency responsible for the care of neglected children;
(B) a child placing agency or other private organization or facility which is licensed or otherwise authorized by law and is designated by the Mayor of the District of Columbia to receive and provide care for the child; or
(C) a relative or other individual who is found by the Division to be qualified to receive and care for the child....
(4) Commitment of the child for medical, psychiatric, or other treatment at an appropriate facility on an out-patient basis if, at the dispositional hearing provided for in section 16-2317, the Division finds that confinement is necessary to the treatment of the child.
(5) The Division may make such other disposition as is not prohibited by law and as the Division deems to be in the best interests of the child....
(6) Terminate the parent and child relationship for the purpose of seeking an adoptive placement....
[7] We do not suggest or believe that the legislature expected the court to disregard the public weal.
[8] By statute, the court's jurisdiction over a neglected child may continue until that child reaches the age of twenty-one, unless sooner terminated in accordance with applicable law. See D.C.Code § 16-2322. When a neglected child is under the court's jurisdiction, the court acts in the role of parens patriae. J.J.Z., supra, 630 A.2d at 193; see also, X.B., supra, 637 A.2d at 1147. In taking responsibility for the child by bringing that child within the jurisdiction of the court, the court acts to protect the child's best interests because the parents are unable or unwilling to do so. J.J.Z., 630 A.2d at 193; see also D.C.Code § 16-2301. "In the District of Columbia parents have an unqualified obligation to contribute to the support of their children." Burnette v. Void, 509 A.2d 606, 608 (D.C.1986). For purposes of child support, a person is considered to be a child until the age of 21 years. D.C.Code § 30-401 (1993 Repl.). Thus, a parent's child support obligation generally continues until the child reaches the age of twenty-one years. Butler v. Butler, 496 A.2d 621, 622 (D.C.1985). Given the role of the court as parens patriae in neglect proceedings, the statutory status of a person as a minor until age 21 both for purposes of support and for purposes of continuing neglect jurisdiction of the court, we conclude that the court remains bound to act with respect to that child's placement consistent with the statutory requirements of the neglect statute after the child reaches the age of 18 years and before he or she attains the age of 21 years. Under that statute, as we have stated previously, before terminating commitment, the trial court must determine whether the commitment is no longer necessary to safeguard the child's welfare and whether termination is in the child's best interest. D.C.Code §§ 16-2323(d) & -2320(a). Of course, the fact that the child is over 18 years and closer to adulthood is an appropriate factor in the court's consideration. Whether T.R.J. was capable of, or in a position to be emancipated, was not addressed in the trial court; therefore, we need not and do not address it here.
[9] Appellant also claims that under the LaShawn A. implementation plan, DHS is required to develop and implement effective independent living services for children aging out of the foster care system before the court can terminate a commitment. See LaShawn A., supra, 762 F.Supp. at 993. This plan dated August 26, 1991, provides that "DHS shall develop and implement effective independent living services for children aging out of the foster care system." It does not appear from the record that the court acted to terminate T.R.J.'s commitment because he was aging out of the system. Rather, it was the court's view that his lack of cooperation rendered continued commitment inappropriate. Had the court continued his commitment, there would have been an opportunity for DHS to address any requirements under the LaShawn A. decision.

Appellant also makes a due process challenge based on the inadequacy of notice and hearing prior to termination. Given the current circumstances and the disposition we reach, we need not decide this issue.