In re D.R., Appellant.

No. 98–FS–443.

District of Columbia Court of Appeals.

Argued Sept. 2, 1998.
Decided Oct. 1, 1998.

Karen Aileen Howze, Washington, DC, appointed by the court, for appellant.

Sheila Kaplan, Assistant Corporation Counsel, with whom John M. Ferren, Corporation Counsel, and Charles L. Reischel, Deputy Corporation Counsel, were on the brief, for appellee.

Before TERRY and REID, Associate Judges, and PRYOR, Senior Judge.

REID, Associate Judge:

Appellant D.R., a neglected child, challenges an order of the trial court sending him to a "locked" residential treatment facility. He contends that the trial court should have applied "the least restrictive environment" standard in determining the appropriate placement for him. We affirm.

## FACTUAL SUMMARY

The record on appeal reveals the following facts. D.R. was born on September 22, 1980. When he was six years old, his parents left him alone in a homeless shelter, together with his siblings. Both parents have suffered from substance abuse, and have been unable to care for their children. D.R. and two of his siblings were placed in emergency care on November 19, 1986. After proceedings were initiated in June 1989 to have D.R. and his siblings adjudicated as neglected, they were placed in shelter care, and later foster care. Following a trial held in April 1990, the trial court determined that the mother had neglected her children. They were committed to the Department of Hu-

man Services, Child and Welfare Services Division, in June 1990. For approximately one month in January 1992, D.R. and one of his brothers resided with their mother under protective supervision. However, they were removed from their mother's care and returned to foster care due to drug dealing in her apartment. Subsequently, in March 1992, D.R.'s mother was arrested and jailed on shoplifting charges. During this time, D.R.'s father had little contact with him or his siblings because of his own drug problem.

In April 1992, D.R. took money from his foster mother's change purse, opened a cupboard where an unloaded gun was kept in the foster home, and took the gun to his bedroom. The foster mother requested that D.R. be removed from her home, and he was placed in the Twentieth Street Therapeutic Home For Boys in Northeast Washington, D.C. From age eleven to seventeen, D.R. studied at several schools, including the Pathways School in Wheaton, Maryland, and Archbishop Carroll High School in the District. Although D.R. is capable of performing well academically, he engaged in disruptive and violent behavior toward staff members during his residential placement at the therapeutic boys' home, and lost his scholarship at Archbishop Carroll High School due to truancy and failure to maintain a "B" average.

D.R. was placed on lithium to control his behavioral moods. In July 1995, he tested positive for marijuana. As a result of his behavior, he was sent to St. Elizabeths Hospital in 1997 for evaluation. Testing by a staff psychiatrist at St. Elizabeths Hospital, Dr. Carlos Astrada, disclosed that D.R. suffered from depression and was a substance abuser (alcohol and marijuana). Although D.R. previously had been diagnosed as a bipolar/manic depressive, Dr. Astrada concluded that he did not suffer from this mental illness, but from "a depressive disorder." Dr. Astrada prescribed an anti-depressant medication for D.R., and recommended long-term placement in a dual diagnostic residential facility geared toward the treatment of substance abuse and emotional problems.

In November 1997, the trial court ordered the District to find a suitable residential placement for D.R. D.R.'s mother concurred with the recommendation of a residential treatment facility. D.R. was transferred to the Department of Human Services' residential treatment unit in January 1998, and in the same month, he was expelled from the Emerson Preparatory School because of truancy. His guardian *ad litem* suggested three possible places, including Jackson Academy in Dickson, Tennessee, and the Bennington School in Vermont. During a hearing on March 28, 1998, before the Family Division of the Superior Court, D.R.'s guardian *ad litem* requested placement at the Bennington School, even though the school was not a certified District of Columbia Medicaid provider, and would not have space for D.R. for two to four weeks. The guardian *ad litem* contended "that it's in— D.'s best interest to go to Bennington." However, even though the guardian *ad litem* considered Bennington the best place for D.R., she also stated: "There is nothing wrong with the Jackson Academy."

In contrast to the guardian *ad litem's* request, D.R.'s social worker, and other District government employees, asked for placement at the Jackson Academy. The assistant general counsel of the Child and Family Services Receiver's Office cited a District of Columbia regulation prohibiting placement of a District Medicaid recipient in a facility having no District Medicaid certification. In addition, D.R.'s social worker emphasized Jackson Academy's experience with youths manifesting anti-social problems; its willingness to tailor an educational program to D.R.'s needs so that he could complete his high school education; the possibility that D.R. could enroll in community college courses upon completion of the high school program; and the immediate availability of a place for D.R. When the court asked D.R. for his views, he expressed preference for Bennington because it was not a locked facility. D.R. stated: "[T]hat's the only thing about the Jackson School that I ... dislike is that it's locked down."

Before the trial court gave its final ruling, D.R.'s guardian *ad litem* declared that St. Elizabeths Hospital had recommended Ben-

nington for D.R., "with the knowledge that it was not a locked facility." She added:

> So, my argument is that the Court ... has the duty and responsibility to provide services that are least restrictive. And, that's the nature of the mental health code. And, for D. to be placed in a locked facility, as is Jackson Academy, would not be the least restrictive environment. And, it would infringe, indeed, upon his liberty interest.

The trial court ordered placement of D.R. at the Jackson Academy as the more appropriate facility for D.R. because "of the kinds of acting out ... that he is engaged in. . . ." In particular, the court singled out D.R.'s "involvement, his attitude with respect to involvements with gangs, and holding guns and that sort of thing." However, the court told D.R. to "give [Jackson Academy] a little time to see how it works ... [but that,] D.R. should call the judge if he just can't hack it."

## ANALYSIS

D.R. contends that the trial court's order of placement at Jackson Academy violated his due process rights and infringed his liberty interests guaranteed by the Fifth Amendment to the Constitution of the United States, because the academy was not the least restrictive facility available to him. He argues that his situation as a neglected child is analogous to that of persons who are civilly committed to the District's Commission on Mental Health, and thus, the trial court should have applied "the least restrictive environment" standard in determining the appropriate placement for him. In addition, he maintains that the court should not have ruled out the Bennington School simply because it was not certified as a Medicaid provider. The District asserts that the trial court properly applied "the best interests of the child" standard in ordering the Jackson Academy placement.

D.R. was adjudicated a neglected child within the meaning of D.C.Code § 16–2301(9)(B)(1981). D.C.Code § 16–2320(a) (1997) provides in part:

> If a child is found to be neglected, the [Family] Division [of the Superior Court of the District of Columbia] ... may order

any of the following dispositions which will be in the best interest of the child . . . .

Among the possible dispositions are those set forth in D.C.Code § 16–2320(a)(4) and (a)(5):

> (4) Commitment of the child for medical, psychiatric, or other treatment at an appropriate facility on an in-patient basis if, at the dispositional hearing provided for in section 16–2317, the Division finds that confinement is necessary to the treatment of the child. A child for whom medical, psychiatric, or other treatment is ordered may petition the Division for review of the order thirty days after treatment under the order has commenced, and, if, after a hearing for the purpose of such review, the original order is affirmed, the child may petition for review thereafter every six months.

> (5) The Division may make such other disposition as is not prohibited by law and as the Division deems to be in the best interests of the child. The Division shall have the authority to (i) order any public agency of the District of Columbia to provide any service the Division determines is needed and which is within such agency's legal authority and (ii) order any private agency receiving public funds for services to families or children to provide any such services when the Division deems it is in the best interests of the child and within the scope of the legal obligations of the agency.

The standard governing § 16–2320(a)(4) and (a)(5) is explicitly set forth: What will be in the best interest or interests of the child. Moreover, as we said in *In re A.M.*, 589 A.2d 1252 (D.C.1991): "In neglect cases, as in most other matters involving the welfare of children, the legal touchstone is the best interests of the child, and those interests are controlling." *Id.* at 1257 (citation omitted).

■ This court will reverse "[t]he trial court's determination of where the best interest of the child lies ... only for an abuse of discretion." *In re A.C.*, 597 A.2d 920, 926 (D.C.1991); *In re A.M., supra,* 589 A.2d at 1257; *see also In re A.S.C.*, 671 A.2d 942, 947 (D.C.1996).

In applying that standard, our task is to ensure that the trial court has exercised its discretion within the range of permissible alternatives, based upon all relevant factors and no improper factor ... and then [to] evaluate whether the decision is supported by substantial reasoning ... drawn from a firm factual foundation in the record.

*In re A.M.*, *supra*, 589 A.2d at 1257–58 (quoting *In re D.R.M.*, 570 A.2d 796, 803–04 (D.C. 1990) (internal quotations omitted)).

Here, the trial court conducted hearings in January and March 1998. It heard from a staff psychiatrist at St. Elizabeths Hospital, D.R.'s social worker, an employee of the residential unit in the Child and Family Services agency, an assistant general counsel for the agency, D.R.'s guardian *ad litem*, and D.R.'s mother. As documentary evidence, the court had before it a written report from St. Elizabeths Hospital, a letter from Jackson Academy, written material on the Jackson Academy educational, therapeutic and recreational programs, and commitment review reports on D.R. and his family prepared by Child and Family Services Division of the Department of Human Services, and the foster care unit of the Family and Child Services Agency of Washington, D.C.[1] Thus, there was a firm factual foundation in the record upon which the trial court ruled.

■ Bennington's lack of certification as a Medicaid provider did not control the trial court's decision to send D.R. to Jackson Academy. Although the judge stated that the lack of certification was "a concern" and "a consideration," he concluded: "[W]e want the best place for this child," and further stated: "I'm familiar with the—with Jackson place to the extent I've talked to people from there in my travels. So, my concern is, indeed, what would be best for this—for this young man." Moreover, the judge focused on D.R.'s desire not to be placed in a "locked down" facility, and said to D.R.:

And D., your—your primary thing is that you don't want to be locked down. That makes some sense. But, there are

lock downs and there are lock downs, you know. This place is—this place is not—it's not a lock down, lock down kind of situation. You're out in—you're away from—you're in the boondocks, [so to] speak. But you're in a good academic setting ....

The trial judge asked D.R. to try Jackson Academy for six months, and to call him if "you just can't hack it." In articulating his findings as to why D.R. needed a residential placement like Jackson Academy, the trial judge pointed to D.R.'s "acting out," his "involvements with gangs, and holding guns and that sort of thing." The judge determined that D.R. "[has] done some reasonably violent things." He added that drug paraphernalia had been found in D.R.'s room, "and his attitude has been that it was all right to be a part of a gang and part of violence. So, he didn't seem to understand that he—that that's not appropriate conduct." The trial judge scheduled a status review for early July 1998. From this review of the record, there can be no doubt that the trial judge "exercised [his] discretion within the range of permissible alternatives, based upon all relevant factors and no improper factor ...." *In re A.M.*, *supra*, 589 A.2d at 1257–58 (citation and internal quotations omitted). We conclude that the trial court's decision to place D.R. at the Jackson Academy is supported by "substantial reasoning ... drawn from a firm factual foundation in the record." *Id.* (citation and internal quotations omitted).

■ In neglect proceedings, the trial court's role is to act as *parens patriae*. *In re T.R.J.*, 661 A.2d 1086, 1092 (D.C.1995) (citation omitted). This means that "the court must act to protect the best interest of the child." *Id.* As we said in *In re T.R.J.*, "this standard ... permeates the [neglect] statutory scheme ...." *Id.* Although "the least restrictive environment" standard has been applied in adult civil commitment proceedings, and those pertaining to juvenile delinquents, we have never applied it explicitly to neglect proceedings. The plain language of § 16–2320(a) contains "the best interest of the child" standard, as does § 16–2320(a)(5);

---

1. During oral argument, counsel for D.R. indicated that a brochure on the Bennington School also had been introduced into the record. The record on appeal does not contain the brochure, but there are references to the Bennington School in the transcripts submitted to us.

and § 16–2320(a)(4), which pertains to commitment for psychiatric or other treatment, does not incorporate "the least restrictive environment" standard. Therefore, under the neglect statute, "the best interest of the child" standard governs D.R.'s situation. Nonetheless, a trial judge, in his or her discretion, may consider "the least restrictive environment" for the neglected child in determining what is in his best interest, but there is no statutory mandate requiring this standard to be applied in neglect cases.

■ Based on the record before us, it is clear that the trial court weighed alternatives for D.R.; sought what was best for him; and concluded that D.R.'s best interest required placement at Jackson Academy, described as a "residential treatment center for emotionally and behaviorally-disturbed, child and adolescent males." The factual record reveals that D.R. engaged in the type of behavior requiring placement in a residential treatment facility that could address his behavioral problems, his depression, and his substance abuse. Given his need for therapeutic treatment, as demonstrated at the hearings in January and March 1998 and in the documents that comprise the record on appeal; in view of the role of the court as *parens patriae*; and in light of the due process accorded D.R. in the form of two hearings, we cannot say that his due process rights or his liberty interests were infringed. Nor do we see any indication that the trial court abused its discretion in sending D.R. to the Jackson Academy.

For the foregoing reasons, we affirm the judgment of the trial court.

*Affirmed.*