**In re A.R., Appellant.**

**No. 06–FS–1202.**

District of Columbia Court of Appeals.

Argued June 6, 2008.

Decided June 19, 2008.

A.R. Marblestein–Deare, Guardian Ad Litem, appointed by the court, for appellant.

Jennifer A. Renton, appointed by the court, for K.R.

Linda Singer, Attorney General for the District of Columbia at the time, Todd S. Kim, Solicitor General, and Edward Schwab, Deputy Solicitor General at the time, and Stacy L. Anderson, Assistant Attorney General, filed a Statement indicating the District would not file a brief in this appeal.

Before REID, KRAMER and FISHER, Associate Judges.

REID, Associate Judge:

Appellant, A.R. appeals the trial court's September 6, 2006, order closing her neglect case, *sua sponte,* after she reached her eighteenth birthday. We conclude that the trial court abused its discretion by failing to base its order on a correct legal principle, the need to safeguard the child's welfare, or the best interest of the child standard. Hence, we are constrained to reverse the trial court's order, and we remand this case for further proceedings consistent with this opinion.

**FACTUAL SUMMARY**

On June 1, 2006, the trial court decided, *sua sponte,* to close A.R.'s neglect case.[1] The court ordered the District and the Child and Family Services agency ("CFSA") to make preparations to close the case, effective July 1, 2006, but did not give reasons for terminating A.R.'s commitment to the care of CFSA. However, after a permanency hearing, held on June 5, 2006, the trial court docketed another order declaring, in part:

[A]ll services have been rendered. The conditions of neglect have been amelio-

---

1. As we indicate later in this opinion, this was not the first time the trial court asserted an intent to close A.R.'s case.

rated. Additionally, the respondent, who is 18 years, has not cooperated with the service plan in that she refuses to comply with the rules of the group home, and she continues to abscond.

While the trial court subsequently extended the closing date to September 6, 2006, it steadfastly adhered to its decision to close A.R.'s case, despite the pleas of attorneys for K.R. (A.R.'s mother), those of the government's counsel, as well as A.R. herself, that closing the case was not in A.R.'s best interest. Nor did A.R.'s later motion for reconsideration persuade the trial court either to abandon its determination to close A.R.'s case, or even to consider seriously whether termination of A.R.'s commitment was in her best interest. Rather, during hearings on June 5 and 29, 2006, the court repeatedly focused on A.R.'s failure to comply with its orders that she not violate the curfews of her placement facilities, and that she not abscond from the facilities in which she had been placed. For example, on June 5, the court asserted:

I seem to recall that we have had an ongoing problem with abscondance on the part of A.[R.].

It seems to me that if she can maintain herself for two weeks on her own, that she no longer needs our assistance. So I need a close out plan and I'm going to give you 30 days....

I've told her repeatedly that I am simply not going to tolerate repeated absences. I've told her that. After I told her that, she still had absences and I let that go. I'm not letting it go this time.

She can't disappear for two weeks and refuse to tell her caretaker ... [CFSA], where she is....

I'm sorry. Let me say this one more time. I have considered this. I have given it a great deal of consideration and I do not take this action lightly. However-

er, repeatedly, she has violated this Court's order. July 1st.

At an early point in the hearing on June 29, 2006, the trial court articulated its intent to close A.R.'s case on that very day. When the government attorney broached A.R.'s continuing needs and her current situation, the trial court returned to the theme of A.R.'s failure to obey court orders:

[S]he decided voluntarily to absent herself from her placement and not to tell CFSA where she is .... [a]fter I repeatedly told her not to run away....

I've told her. It's not as though I have not repeatedly told her what I wanted her to do, and all I wanted her to do was not to disrupt her placement, not to run away....

[S]he's 18 years old. I'm closing this case today....

[S]he repeatedly violates the Court's order, repeatedly.

At the June 2006 hearings, the trial court resisted reminders about the promise and problems of A.R. A.R.'s troubled existence surfaced in Fall 2002, when her temporary guardian took all of A.R.'s belongings to the Maya Angelou Public Charter School where she was a student. The guardian announced that she no longer could care for A.R. K.R., A.R.'s mother, who then was a substance abuser, but had a relationship with A.D., asked CFSA to place A.R. with A.D., who was like a father to A.R. By early January 2003, A.D. informed A.R.'s school that he was unwilling to continue caring for her because of her negative behavior.

After investigating A.R.'s situation, CFSA learned that K.R. had not cared for A.R. during the past five or six years. During that period of time, A.R. stayed with different relatives. When A.R. attempted suicide in December 2002, K.R.

took her to the Psychiatric Institute of Washington. A.R. remained there for a two-week period. Although K.R. picked A.R. up from the Institute, she disappeared after returning A.R. to the care of A.D. When A.D. declared his unwillingness to care for A.R., CFSA's efforts to place A.R. with her maternal grandmother were unsuccessful. Therefore, on January 8, 2003, CFSA filed a neglect petition in the Superior Court, and A.R. was placed immediately in shelter care. Subsequently, K.R. signed a stipulation in early February, indicating that neither she nor A.D. was able to care for A.R.'s needs. The Institute's January 21, 2003, discharge summary described A.R. as "defiant, oppositional, uncooperative and suicidal." On February 20, 2003, the trial court committed A.R. to the care and custody of CFSA, and arranged for visitation between K.R. and A.R. and drug and alcohol testing for A.R. Beginning in February, CFSA developed alternative goals for A.R.—reunification with her mother or independent living.

A.R. proved to be an excellent student, with "A" and "B" grades. She excelled in debate activities, and aspired to a college education. But A.R. continued to encounter serious problems along the way. She ran away and absconded from her VOCA Group Home on June 9, 2003, and apparently began to take drugs. On February 24, 2004, the trial court issued an order pertaining to her tendency to run away, and required therapy and drug testing, as well as relocation to a therapeutic foster home or a "proctor home." As a result, A.R. began therapy at Children's Hospital. She also submitted to weekly drug tests, which soon revealed negative results. Her transfer to a foster home proved successful until she began to violate her curfew around July 2004.

By August and September 2004, A.R.'s foster parent experienced serious problems with A.R.—violation of her curfew, refusal to do her chores, and allowing her boyfriend into the house without permission. On occasion, K.R. found A.R. at the boyfriend's residence and returned her to the foster home. In September 2004, the trial court ordered monthly drug testing for A.R. and a return to therapy at Children's Hospital "on a consistent and regular basis." The court also ordered A.R. to comply with her curfew and the foster home rules. By the end of 2004, the court ordered weekly therapy for A.R., family therapy for K.R. and A.R., and asked CFSA to submit a report on the status of efforts to get A.R. into an independent living program.

A.R.'s involvement with her boyfriend increased in 2005, and new developments complicated her future. On May 3, 2005, the trial court ordered a criminal background check of the boyfriend, instructed A.R. not to remain in his home overnight, and permitted day visits with him, provided the criminal background check revealed no criminal history and A.R. "refrains from absconding from her placement." A.R. became pregnant, and on September 13, 2005, approximately one month prior to the birth of A.R.'s daughter, the trial court announced that it would consider closing A.R.'s case on her 18th birthday, in October 2005, due to her failure to comply with her curfew. However, the trial court did not close the case in October 2005.

Despite giving birth to her daughter, A.R. decided to proceed with her plans to enter college. By 2006, A.R. found herself in an abusive relationship with her boyfriend, and often in violation of the curfew established by her group home. In January, when she went to pick up her daughter, he beat her so severely with his closed fist that she had to seek medical treatment at a hospital. A.R. complied with the court's order that she obtain a civil

protection order against her boyfriend, the father of her daughter. But she soon returned to her relationship with him, apparently due, in part, to her work on the 4 p.m. to midnight shift at a CVS store, and her need for child care when her mother, K.R. (who had enjoyed sobriety for a few years since her treatment but who still was attempting to obtain permanent housing) was unable to assist. Because of her work schedule, A.R. violated her curfew, and had to be removed from her NAFFC-CA placement after absconding on April 26, 2006. On May 11, 2006, A.R. and her daughter were placed with Bright Future's Teen Mother's program. She had to drop out of the university but planned to return for the Spring 2007 semester.

After the June 29, 2006 hearing, CFSA worked with A.R. in an effort to find suitable independent housing for her. By the time of the trial court's Wednesday, September 6, 2006 hearing, A.R. had obtained an apartment (on August 25), but her move had been delayed due to the need to furnish the apartment and to move on a weekend because of her work schedule. The trial court rebuffed requests from the government, the guardian *ad litem*, and the social worker that the case not be closed for a few days saying, "I don't understand you people." The court added:

> We've had this discussion. We've talked about this. You people knew this was coming. It's your job to pull this thing together and make it work. So, scramble on because I'm closing this case today.

The trial court closed the case on September 6, 2006. In its order, the court

checked form boxes stating, "Permanency Goal Achieved," and "Child Reached Age of Majority." In addition, the trial judge wrote: "[C]hild conducts herself independently. [C]hild consistently fails to adhere to directives of court."

## ANALYSIS

■ In essence, A.R. and her mother contend that the trial court erred by failing to apply the best interest of the child standard prior to closing A.R.'s case.[2] In *In re T.R.J.*, 661 A.2d 1086 (D.C.1995), we held that:

> [W]hen the Superior Court has acquired jurisdiction of a neglected child and committed that child for care to the public agency responsible for the care of neglected children and is requested to terminate the child's commitment prior to his or her twenty-first birthday, it must first find that commitment is no longer necessary to safeguard the child's welfare and should frame that finding . . . in terms of the child's best interest.

*Id.* at 1087. We determined that "the best interest of the child" standard "permeates" and "is consistent with the statutory framework of the neglect statute,"[3] and "must be considered when the court acts to terminate the commitment of a child." *Id.* at 1092.

In *T.R.J.*, as here, the trial judge expressed frustration and impatience with a child who had reached the age of 18, had a history of not complying with the rules of a group home, as well as a history of suicidal tendencies requiring therapy, and the agency's efforts had not been "effective."

---

**2.** K.R. did not file a notice of appeal, but her attorney submitted a brief and gave oral argument in this matter. No objection to her appearance was raised.

**3.** *See* D.C.Code § 16–2320(a) (2001) (court "may order any of the following dispositions

which will be in the best interest of the child . . . ."); § 16–2323(f) (specifying what the court may do if it "finds that the commitment of the child . . . is no longer necessary to safeguard the welfare of the child").

*Id.* at 1090, 1093. There, as here, despite the educational efforts and achievements of the appellant and the continuing emotional problems affecting him, "the [trial] court decided that the time had come [to] let [appellant] support himself ...," *id.* at 1089–90, 1092, but the judge did not make requisite findings under "the best interest of the child" standard, *id.* at 1093.

During the June 29, 2006 hearing, there were at least three times that the trial court commented on A.R.'s best interest. First, when a supervising social worker called the court's attention to the impact closing A.R.'s case would have on A.R.'s baby:

> [A.R.'s] the type of girl [who] has ... promise. She can go to college. She's a good mother, but the problem we have is ..., if the case is closed, that child, the little girl, will become homeless and we'll have to ... take her into care. We want to prevent that....

The trial judge responded: "There are a lot of great foster families out there. I've met some of them." The judge did not regard A.R. as a good mother because "[b]eing a good mother is somebody who plans for [her] child's future and acts in the child's best interest. It was certainly not in A.[R.'s] best interest to violate the Court orders ... and most definitely not in [her] child's." Second, after A.R. addressed the court, pleading that her case not be closed because of the steps she had taken to extricate herself from her problems, especially her boyfriend, and the impact that closure would have on her daughter, K.R.'s attorney stated: "I think it's clear that it's really not in A.[R.]'s best interest to close the case at this time." The judge replied: "It's not clear to me." Third, counsel for K.R. made another attempt to convince the trial court that it was not in A.R.'s best interest to close her case:

> Institutional care, Your Honor, is not the same as having that family behind you from the time you grew up and I think we have to acknowledge this is a person that has vulnerabilities who lacks self-control. But that doesn't make it in her best interest to close the case, and I guess I don't understand how it could be in her best interest to close her case at this time.

The trial court responded: "Well, that's unfortunate for you. All right. So what are you going to do?" Following further pleas from the government and A.R., the trial court relented somewhat by agreeing to wait until September 6 to close A.R.'s case.

▮ Nevertheless the trial court never made "the best interest of the child" findings. As we have previously stated, however, even though "the proper disposition of a[ ] [neglected] child is committed to the sound discretion of the trial court," that discretion must rest upon "correct legal principles." *In re S.L.E.*, 677 A.2d 514, 519 (D.C.1996); *see also In re D.B.*, 879 A.2d 682, 690 (D.C.2005). Hence, on this record, we hold that the trial court failed to make a "find[ing] that [A.R.'s] commitment [to CFSA] is no longer necessary to safeguard ... [her] welfare," that is, that it is in A.R.'s best interest to terminate her commitment. *T.R.J.*, 661 A.2d at 1087; *see also In re J.E.H.*, 689 A.2d 528, 529 (D.C.1996). Consequently, we are constrained to reverse the trial court's order of September 6, 2006, and to remand this case for further proceedings consistent with this opinion.

*So ordered.*